607 A.2d 1111

**Frederick FRITER and Sally Friter, Appellant,**

v.

**IOLAB CORPORATION, Johnson & Johnson, Inc., Robert Reinecke, M.D., Jerome Peters, M.D., Estate of Kenneth Michaile, M.D., Deceased, and Kenneth Michaile, M.D., Ltd., and Wills Eye Hospital.**

Superior Court of Pennsylvania.

Argued Sept. 18, 1991.

Filed May 1, 1992.

Gerald A. McHugh, Jr., Philadelphia, for appellant.

Stephen A. Ryan, Bala Cynwyd, for appellees.

Before JOHNSON, FORD ELLIOTT, and HESTER, JJ.

FORD ELLIOTT, Judge:

This is an appeal from the October 18, 1990 order of the Court of Common Pleas of Philadelphia County granting defendant Wills Eye Hospital's motion for judgment *non obstante verdicto*. We reverse.

On November 22, 1982, Dr. Kenneth Michaile implanted an Iolab Model 91Z anterior chamber intraocular lens into Frederick Friter's left eye following cataract surgery at Wills Eye Hospital. This particular intraocular lens rests behind the cornea and serves as a substitute lens after the

opacified natural lens has been removed from the eye. At the time of Mr. Friter's surgery, this particular lens had not yet been approved for general use by the United States Food and Drug Administration (FDA), but rather was the subject of a clinical investigation to determine its safety.

Prior to Mr. Friter's surgery, Wills Eye Hospital had applied for and received approval to participate in a clinical study involving the Iolab Model 91Z lens. The hospital named Dr. Michaile, a member of its medical staff, to be one of its registered investigators with permission to implant the experimental lens. Both Dr. Michaile, as a registered investigator for Iolab, and Wills Eye Hospital, as an approved institution for conducting experimental studies, were bound by FDA regulations to obtain an informed consent from any patient undergoing experimental treatment. The special five-page consent form explained, among other things, the nature of the clinical investigation, the existence of known complications, and the fact that there were, as yet, undetermined complications.

Frederick Friter was never informed, prior to surgery, that he was about to become a participant in a clinical investigation, and that he was about to have an unapproved medical device implanted in the interior portion of his eye as a substitute for his natural lens. As a result of the surgical implantation of the Iolab 91Z lens, Mr. Friter suffered numerous complications, including filamentary keratitis, chronic and recurrent uveitis, damage to the corneal endothelium, hemorrhage, and the threat of loss of vision in the eye.

As a result of the damage caused to his eye, Frederick Friter, and his wife Sally, filed suit against the Estate of Kenneth Michaile, M.D., deceased, Kenneth Michaile, M.D., Ltd., and Wills Eye Hospital, seeking recovery for the injuries sustained by the unauthorized placement into his eye of an intraocular lens which had not yet been approved and was still under investigation by the FDA. At trial, the Friters asserted claims of battery against Dr. Michaile and Wills Eye Hospital for failing to obtain an informed consent

prior to performing surgery on Mr. Friter's eye. A jury trial commenced in the court of the Honorable Murray C. Goldman on September 19, 1989. On September 28, 1989, the jury returned a verdict in favor of the Friters and awarded Mr. Friter 1.5 million dollars in damages, and Mrs. Friter $250,000 in damages.

Post-trial motions were subsequently filed on behalf of Dr. Michaile and Wills Eye Hospital. The Friters settled with the Michaile defendants. However, the trial court granted Wills Eye Hospital's motion for a judgment n.o.v. This timely appeal followed. Appellants now raise two issues for our consideration.

I. Did not the trial court erroneously enter judgment in favor of Wills Eye Hospital notwithstanding the jury's finding that Wills Eye Hospital had assumed the responsibility of supervising the obtaining of plaintiff's informed consent to surgery involving an unapproved medical device which was under investigation by the defendant hospital?

II. When a hospital agrees to conduct a clinical study of a medical device under investigation by the Food and Drug Administration and selects the surgeons who will carry out the study, and where the hospital admits that it was the hospital's responsibility to assure that all physicians who participated in the investigations were obtaining informed consent of their patients, is not the hospital liable for damages resulting from the surgeon's failure to obtain informed consent?

Appellee, in its counter-statement of the questions presented, has framed the issues as follows:

I. Did the trial court correctly refuse to allow the hospital to be held liable for the intentional battery of failing to obtain an informed consent?

II. Did the trial court correctly grant the hospital judgment n.o.v. where the law of this Commonwealth has never imposed a duty to obtain a patient's informed consent on a hospital?

III. Did the trial court correctly determine that, despite a hospital's involvement in a clinical investigation, a hospital cannot be held liable for the tort of intentional battery?

In essence, all five questions presented to this court for review focus upon the same central consideration: whether appellants, proceeding against the hospital under a theory of lack of informed consent, pled and proved facts sufficient to justify the jury's verdict against Wills Eye Hospital, given that this Commonwealth, heretofore, has never recognized an informed consent action against a hospital. It is that central question upon which this opinion will focus.

Instantly, we note that our standard of review when considering an appeal from an order granting a judgment n.o.v. is well settled.

> In the review of the record in an appeal from an order of a trial court which has granted judgment n.o.v., we are required to consider the evidence and all reasonable inferences therefrom in the light most favorable to the verdict winner.

*Lowry v. State Farm Insurance Co.,* 392 Pa.Super. 77, 80, 572 A.2d 700, 701 (1990). The entry of judgment n.o.v. will be reversed whenever the evidence favorable to the plaintiff, and the reasonable inferences therefrom, support plaintiff's theory of liability. *Handfinger v. Philadelphia Gas Works,* 439 Pa. 130, 266 A.2d 769 (1970). It is with this standard in mind that we address the merits of this case.

The gravamen of appellants' action against Wills Eye Hospital was that the hospital failed in its duty to ensure that a legally effective informed consent was obtained from Mr. Friter prior to his surgery. Historically, the doctrine of informed consent has been interpreted by appellate courts of this Commonwealth to apply only to surgeons who perform operations without first securing the informed consent of the patient. The unconsented to operation is considered a non-consensual touching, thus giving rise to an action by the patient for a "technical" battery. *Doe v. Dyer–Goode,* 389 Pa.Super. 151, 566 A.2d 889 (1989);

*Malloy v. Shanahan,* 280 Pa.Super. 440, 421 A.2d 803 (1980). To date, a hospital has never been held liable to a patient under a theory of lack of informed consent. Appellee relies upon this well settled case law to support its position that the trial court's decision to grant the motion for judgment n.o.v. was correct. However, such reliance ignores the factual context in which these decisions rest. Indeed, were we to view this case as a traditional lack of informed consent action against a hospital, we would be constrained to follow precedent and affirm the trial court's order. A review of trial court cases which have addressed this issue demonstrates that two prevailing reasons are offered for relieving the hospital of liability.

The first reason offered is that Pennsylvania case law on informed consent is premised on a battery arising out of a medical procedure performed by a physician and therefore the duty to inform as to the risks associated with that procedure only runs as between doctor and patient. This "duty" analysis was summarized by the trial court in *Margotta v. Lancaster General Hospital,* 47 Pa. D. & C.3d 300 (1987).

Our research uncovered only one Pennsylvania case, *Hurley v. Won,* 9 [Pa.] D. & C.3d 796 (1979), which dealt specifically with a hospital's duty to obtain a patient's informed consent. *Hurley* at 798, held that there is no duty, in Pennsylvania, on a hospital to obtain consent from a patient prior to an operation.

. . . .

Our research failed to uncover any Pennsylvania authority for imposing an independent duty on a non-physician to obtain a patient's informed consent. See, e.g. *Smith v. Yohe,* 412 Pa. 94, 194 A.2d 167 (1963); *Gray v. Grunnagle,* 423 Pa. 144, 223 A.2d 663 (1966); *Cooper v. Roberts,* 220 Pa.Super. 260, 286 A.2d 647 (1971) (allocatur refused); *Malloy v. Shanahan,* 280 Pa.Super. 440, 421 A.2d 803 (1980) (plurality decision); *Boyer v. Smith,* 345 Pa.Super. 66, 497 A.2d 646 (1985); and *Festa v. Greenberg,* 354 Pa.Super. 346, 511 A.2d 1371 (1986).

Accordingly, we agree with both parties that Pennsylvania does not recognize an independent duty on a non-physician to obtain a patient's informed consent. Absent the recognition of such a duty, we do not accept plaintiff's invitation to create such a duty. Under the current state of the law, it appears with certainty that plaintiff can not recover under Count II [informed consent].

*Id.* at 305–06.

As noted by the trial court in *Margotta,* Pennsylvania case law reflects the notion that heretofore it is only the physician who has been held liable under a theory of lack of informed consent, for it is the physician who has the duty to obtain the consent for a medical procedure which the physician performs. In the traditional surgical setting, this analysis is well founded. However, the facts of this case are quite different for we are not here addressing the duty owed by a physician to a patient but rather a duty owed by the hospital to the patient. In this instance, the hospital, as a participant in a clinical investigation for the FDA, specifically assumed a duty to ensure that an informed consent was obtained by any patient participating in the study.

In particular, under applicable federal regulations, *Wills Eye Hospital had an affirmative duty to "[a]ssure* that the rights of human subjects are properly protected, *that legally effective informed consent is obtained, and that the methods of obtaining consent properly informs the human subject of the significant aspects of the study . . ."* 21 C.F.R. § 813.66(a)(6) (emphasis added). The legally effective informed consent referred to in the regulations was a specially designed five-page consent which informed the patient of the significant aspects of the study, including any and all special risks associated with an investigational study. As further evidence of the hospital's duties toward Mr. Friter, appellants offered the testimony of Dr. Thomas D. Duane who was the ophthalmologist in chief at Wills Eye Hospital at the time of Mr. Friter's surgery. The following excerpt from Dr. Duane's testimony clearly establishes that the hospital understood it had a duty to ensure that any

doctors participating in investigational studies were obtaining the special informed consents required by the FDA.

Q. What I was asking you was, was it part of the function of the Institutional Review Committee to make sure that the investigating doctors were obtaining the informed consent of their patients?

A. Yes.

Q. How, if you know and if you remember, did the Institutional Review Board go about making sure that the investigating doctors were obtaining informed consent before implanting experimental lenses in their patients' eyes?

A. We would have a discussion of it before it was instituted as a rule and then it would be professionally up to the record room to tell us whether such a form is being used, and they check on each record because they know it might be taken home by the ophthalmologist.

Q. All right. So what you're saying is that there was a rule at the hospital that a person in the record room was to check to make sure that the special consent form was in the file?

A. For an investigational study.

Q. For an investigational study.

A. Yes.

Q. And if the consent form was not in the file, what was the record custodian supposed to do?

A. Report it to the ophthalmologist in chief, and I would get the guy and the hospital director and ask him why the hell he hadn't filled out the form.

Q. Okay.

A. It's very important.

Q. Was that an ongoing function throughout the investigational study?

A. Yes.

Trial transcript, 9/19/89 at 323–24.

Further evidence of the hospital's duty presented itself through one of the hospital's own witnesses. Dr. Jay

Federman, chairman of the hospital's Institutional Review Committee, also testified to the fact that it was the hospital's duty to "assure that all physicians who partook in those investigations had an informed consent signed ..." Trial Transcript, 9/19/89 at 706. In fact, the hospital had devised a method to ensure its duty to obtain an informed consent was fulfilled. Two witnesses called by the hospital, Drs. Grohsman and Belmont, confirmed that it was standard procedure that the head operating room nurse was not to allow an operation involving an investigational medical device to go forward without the necessary special investigational consent form having been signed and placed in the patient's chart. However, in this instance, it is undisputed that a signed consent form was not in Mr. Friter's chart.

Thus, under the facts presented in this case, the hospital had assumed a duty, pursuant to FDA regulations, to ensure that any patient involved in a clinical study was made aware of the clinical nature of the procedure and the risks associated with such experimentation, and had signed a consent form acknowledging that fact.

Therefore, one impediment as to why an informed consent action cannot lie against a hospital, that being the fact that only the physician has the duty to obtain the consent, does not exist in this case. To the contrary, federal regulations specifically mandated that the hospital assume the duty of obtaining informed consent.

The second major obstacle offered as to why a hospital cannot be held liable in an informed consent action, is that informed consent is a battery action, and a hospital cannot commit a battery. However, a review of the definition of a battery reveals that in this instance the hospital can be found to have committed a technical battery. The Restatement (Second) of Torts, § 18, states that "[a]n actor is subject to liability to another for battery if (a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person ..." In comment (c) to section 18 the meaning of "contact with another's person" is more fully explained. As noted therein, "[i]t is not

necessary that the contact with the other's person be directly caused by some act of the actor. All that is necessary is that the actor intend to cause the other, directly or indirectly, to come in contact with a foreign substance in a manner which the other would reasonably regard as offensive."

In this instance, by applying to become and actually becoming an approved institution for conducting clinical studies, Wills Eye Hospital intended to cause patients to come in contact with a foreign substance, namely, the experimental intraocular lens. At the same time, the hospital agreed to abide by the federal regulations requiring it to ensure all patients were informed of the experimental nature of the study and signed consent forms attesting to that fact. By failing in its duty to Mr. Friter to obtain his informed consent, the hospital rendered Mr. Friter's contact with the foreign substance one which Mr. Friter reasonably considered offensive. Thus, the hospital may now be held liable for committing a technical battery upon Mr. Friter.

The idea that a corporation such as Wills Eye Hospital can be held liable for the intentional tort of battery is not new. In *Field v. Philadelphia Electric Company*, 388 Pa.Super. 400, 565 A.2d 1170 (1989), this court held an electric company liable for the intentional tort of battery. Analyzing comment (c) of section 18 of the Restatement (Second) of Torts, this court concluded that the electric company had produced a contact, such that it could be held liable for battery.

The next issue before us is whether count one of appellants' complaint, entitled tort of intentional exposure to radiation, states a cognizable cause of action. We conclude that it does. In the count, appellants allege that PECO deliberately exposed Field to radiation by operating the reactor knowing that Field would be exposed to dangerous levels of radiation and by deliberately venting radioactive steam on Field knowing his location. We believe this states a cause of action in battery. *See* Restatement (Second) of Torts § 13 (battery requires intent to cause offensive contact and resultant harmful

contact).  The intentional act of venting steam where the steam produced the contact is sufficient to state an actionable battery.  *See* Restatement (Second) of Torts § 18 comment c (intent to contact someone with offensive foreign substance constitutes contact for purposes of battery).

*Id.*, 388 Pa.Superior Ct. at 416–17, 565 A.2d at 1178.

Similarly, in the present case, the hospital, by participating in the clinical study, intended contact with patients who were to receive the experimental lenses.  Such contact by its nature is offensive.  It is only when a consent to such a touching is obtained that the hospital has a defense to the battery, as consent to the touching provides a defense in battery actions.  However, in this instance, the hospital failed in its duty to obtain that consent.  Furthermore, as noted by this court in *Field,* the fact that the corporation did not intend to harm anyone, is immaterial.  *Id.*  Thus, while we do not doubt that Wills Eye Hospital never intended to harm Mr. Friter, that does not relieve them of liability for the battery in this instance.[1]

In conclusion, because under the facts of this case we find that Wills Eye Hospital had assumed an independent duty to obtain Mr. Friter's informed consent, and because the hospital intended Mr. Friter to come in contact with a foreign substance by way of the investigational study, there is no reason why the hospital should not be held liable under an informed consent cause of action.  The record reveals that the nature of the hospital's duty to obtain the

---

1.  Before concluding, we note that this court is well aware that the supreme court formally adopted the doctrine of corporate liability in *Thompson v. Nason Hospital,* 527 Pa. 330, 591 A.2d 703 (1991), while this matter was pending on appeal.  In fact, a review of the pleadings and transcript of this case reveal that appellant actually pled and proved all of the elements comprising a corporate liability action.  However, appellant did not ask us to apply that doctrine to the pleadings and transcript of this case, but rather requested we expand the doctrine of corporate liability to encompass battery actions.  This we will not do, as corporate liability has to date been premised on proof of negligence.  However, it is interesting to note that at the crux of the corporate liability doctrine is the notion that certain duties run directly from the hospital to its patients.

consent was proved to the jury, and the jury recognized the existence of that duty. Accordingly, the jury returned a verdict in favor of plaintiff. Thus, we conclude that under the facts presented in this case, Wills Eye Hospital may be held liable for failing to obtain Mr. Friter's informed consent. Therefore, the trial court erred in granting the hospital's motion for judgment n.o.v.

Although our decision to reverse the trial court order granting Wills' motion for judgment n.o.v. effectively disposes of this case, for the sake of completing the record on remand we note that Wills' had also raised several other trial errors by way of post-trial motions. Specifically, Wills' alleged that appellants had failed to provide expert medical testimony to prove their case; that the trial court had erred in admitting the FDA regulations into evidence; that the trial court erred in permitting appellant's expert, Dr. Kirschner, to testify beyond his area of expertise and beyond the scope of his report; the trial court erred in admitting the testimony of Dr. Duane; and that the trial court erred in denying Wills' motion for a post-trial evidentiary hearing. With respect to these remaining issues, we find that Judge Goldman has thoroughly and correctly disposed of them in his October 19, 1990 opinion and therefore affirm on the basis thereof.

We also note that through post-trial motions Wills raised issues concerning allocation of damages and remittitur, and appellants presented a petition for delay damages. The trial court found these issues to be moot in light of its decision to grant the hospital's motion for judgment n.o.v. Now that we have reversed the trial court's order, the trial court will necessarily have to consider remittitur and delay damages in accordance with our remand order.

Accordingly, the order of the trial court granting Wills Eye Hospital's motion for judgment n.o.v. is reversed. The case is remanded to the trial court for further proceedings consistent with this opinion.

Order reversed. Verdict reinstated and case remanded for judgment thereon. Jurisdiction relinquished.