**Tuttle v. Silver**

*Catherine M. Mahady-Smith,* for plaintiffs.

*Katherine B. Kravitz,* for defendant Lawrence B. Silver, M.D.

*Richard C. Seneca,* for defendants Victoria Myers, R.N., and Polyclinic Medical Center.

DOWLING, *J.,* June 25, 1993—

But the spirit of the Lord came upon Gideon, and he blew a trumpet.[1]

Judges VI:34

In a 429-paragraph complaint, plaintiffs have sued defendants on theories of negligence, intentional infliction of emotional distress, negligent infliction of emotional distress, and lack of informed consent. The pleading is in extraordinary detail with numerous subdivisions to many of the paragraphs. Not surprisingly, however, defendants have filed a number of preliminary objections. Fortunately, all have been resolved by the parties with the exception of three issues:

(1) The claim of Raymond A. Tuttle for intentional infliction of emotional distress;

(2) The wrongful death and survival action on behalf of the decedent; and

(3) The lack of informed consent on the part of the hospital.

Defendant Dr. Lawrence B. Silver and his professional corporation demur to Count V of plaintiffs' complaint which sets forth the claim for intentional infliction of emotional distress on behalf of Raymond A. Tuttle. Procedurally, the allegation must be accepted as fact. Whether the probation will sustain the averments is for another day.

Despite some confusing language to the contrary, Pennsylvania has not rejected the tort of intentional infliction of emotional distress. We refer to our opinions on the subject in *Ford v. Starobin,* 109 Dauphin Co. Rep. 52 (1981) and *Sears v. Hershey Medical Center,* 111 Dauphin Co. Rep. 60 (1991). More authoritatively,

---

1. As we noted in *Ford v. Starobin, infra,* this particular tort was waiting for "Gideon's trumpet."

we would reference *Field v. Philadelphia Electric Co.,* 388 Pa. Super. 400, 565 A.2d 1170 (1989). In *Banyas v. Lower Bucks Hospital,* 293 Pa. Super. 122, 437 A.2d 1236 (1981), the court stated:

"[1] The intentional infliction of mental distress is an actionable wrong in Pennsylvania. See *Papieves v. Lawrence,* 437 Pa. 373, 263 A.2d 118 (1970); *Jones v. Nissenbaum, Rudolph and Seidner,* 244 Pa. Super. 377, 368 A.2d 770 (1976); *Chuy v. Philadelphia Eagles Football Club,* 595 F.2d 1265 (1979).

"Section 46 of the Restatement (Second) of Torts §46 (1965) provides in part:

"(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

"Comment d to Section 46 explains,

"Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor and lead him to exclaim, 'Outrageous!'

"As the Supreme Court said in *Jones, supra,* 'It is apparent that the gravamen of this tort is that the conduct complained of must be of an extreme or outrageous type.' *Id.,* 244 Pa.Super. at 383, 368 A.2d at 773." *Banyas, supra* at 126, 437 A.2d at 1238.

The pertinent allegations from the complaint may be summarized as follows:

Before noon on July 16, 1990, plaintiff Donna Tuttle went into premature labor when her membranes ruptured. She was almost six months pregnant, and Dr. Silver had been treating her throughout her term. Mrs. Tuttle spoke to Dr. Silver who indicated he believed that her problem was a bladder infection, but offered to let her come into the office. Eventually, Dr. Silver examined Mrs. Tuttle and realized she was in labor. He instructed her to go to the hospital so that an attempt could be made to stop her labor.

She was driven to the Polyclinic Medical Center by her parents where they were met by plaintiff Raymond Tuttle. Dr. Silver never suggested an ambulance. Contrary to his assurances, the doctor did not call ahead to make arrangements. Mrs. Tuttle went to the obstetrical floor, but as no arrangements had been made, there was a lengthy delay. Finally, after 2:20 p.m., she was admitted and placed into a room. Her labor continued with only defendant Nurse Victoria Myers present, along with Mr. Tuttle. A viable baby was delivered at 4:15 p.m. with his heart beating. After going through five minutes of standard post-delivery procedures, Nurse Myers asked Mr. Tuttle how hard they should try to save the premature newborn. He insisted that all efforts were to be expended.

Unfortunately, the baby soon died. It is claimed that the baby could have been saved if timely efforts had been made to resuscitate him. Other babies of equivalent development had previously been delivered at Polyclinic and survived with appropriate measures. Nothing had been done to give Mrs. Tuttle's baby its best chance to survive. Short of stopping labor, the baby's best chance of survival was with a caesarean section for which no preparations were made. No physicians saw her, and no emergency equipment was provided. Dr.

Silver never came to the hospital until well after the baby had died. To add insult to injury, he billed Donna Tuttle for delivery.

Mrs. Tuttle had previously decided to become sterilized by tubal ligation after her baby's birth. That same evening, in the hospital Dr. Silver asked about this, as well as permission for an autopsy. Mrs. Tuttle was crying, traumatized, emotionally devastated and unable to decide. Dr. Silver recommended the surgery. In preparation for sterilization, blood tests were performed, all of which showed abnormal results. Although Mrs. Tuttle was extremely emotional, Dr. Silver began surgery. He opened Mrs. Tuttle's abdomen and removed virtually all of her fallopian tubes. Unlike tubal ligation, this surgery was very involved, has significant scarring, and is completely irreversible.

In brief, it is alleged that Mr. Tuttle was present in his wife's hospital room for some two hours while she was in premature labor, that Dr. Silver did not come to the hospital, and that no physician was in attendance. It is argued that not to regard the physician's conduct as abandonment of his patient in premature labor and to consider his failure to take any steps to save the baby's life as being less than intolerable professional conduct would be tantamount to holding that there is no cause of action for intentional infliction of emotional distress in Pennsylvania. We would agree.

Defendant Silver argues that the outrageous conduct will not be dispositive unless the plaintiff proves the existence of the emotional distress by competent medical evidence. But this is not a matter to be determined at the preliminary objection stage.

Defendant Silver also contends that in an action for intentional infliction of emotional distress, physical injury must be pled. While there may be some question

as to the necessity for such an allegation in a negligent infliction of emotional distress case, there is no such requirement in a claim of intentional infliction of emotional distress.[2]

It is interesting to note that there was no demurrer to Donna Tuttle's claim for intentional infliction of emotional distress.

The second remaining preliminary objection is easily disposed of. Defendants Myers and Silver demur to the survival and wrongful death action for the death of plaintiffs' decedent Matthew Ryan Tuttle, as the complaint would indicate that the baby was less than six months gestational age. Thus, defendants conclude that the baby was nonviable and argue that under Pennsylvania law no cause of action can be asserted. This "speaking demurrer" is not sustainable, either factually or legally. The complaint quite clearly alleges that Mrs. Tuttle's fetus was viable at birth. (Paragraphs 117-120.) On a demurrer, this is equated as an established fact.

In all of the cases cited by defendants, the parties either stipulated to the fact that the fetuses were nonviable or viability was not an issue in the case. Nowhere in any of defendants' cases did the court decide a medically-disputed question of fetal viability. It is undisputed that Pennsylvania recognizes a cause of action for a viable fetus. See *Amadio v. Levin,* 509 Pa. 199, 501 A.2d 1085 (1985) and *McCaskill v. Housing Authority,* 419 Pa. Super. 313, 615 A.2d 382 (1992).

There remains the issue of Donna Tuttle's alleged lack of informed consent count (Count XIV) against the Polyclinic Hospital for failure to obtain her consent

---

2. See our opinion in *Shaffer v. Polyclinic Medical Center, supra,* wherein we expressed the opinion that even in negligent infliction of emotional distress, allegations of physical harm need not be asserted.

to the sterilization surgery by Dr. Silver.[3] The same claim is made by the plaintiffs in their corporate negligence count (Count XV) against the hospital at paragraphs 411 and 183 of the complaint.

We have reviewed this situation in *Summers v. Ruben,* 112 Dauphin Co. Rep. 479 (1993), noting the general rule that our Commonwealth has never recognized an informed consent action against a hospital. We did, however, point out two exceptions; *Friter v. Iolab Corp.,* 414 Pa. Super. 622, 607 A.2d 1111 (1992), where the hospital was participating in a study and, as such, was bound by FDA regulations to obtain an informed consent from any patient undergoing experimental treatment, and in our own case of *Wolgemuth v. Hershey Medical Center,* 111 Dauphin Co. Rep. 353 (1992), where we permitted such a count to proceed because the defendant doctor was a resident chosen and supplied by the defendant hospitals.

We are now asked to further extend the principle on the doctrine of "corporate negligence" recently adopted by our Supreme Court in *Thompson v. Nason Hosp.,* 527 Pa. 330, 591 A.2d 703 (1991). In approving this new cause of action, the court noted that it "creates a nondelegable duty which the hospital owes directly to a patient." *Id.* at 339, 591 A.2d at 707. The court classified the hospital's duties into four general areas:

"... (1) a duty to use reasonable care in the maintenance of safe and adequate facilities and equipment—*Chandler General Hospital Inc. v. Purvis,* 123 Ga.App. 334, 181 S.E.2d 77 (1971); (2) a duty to select and retain only competent physicians—*Johnson v. Misericordia Community Hospital,* 99 Wis.2d 708, 301 N.W.2d 156

---

3. A similar claim is made against Dr. Silver in Count VI which is not before us for resolution.

(1981); (3) a duty to oversee all persons who practice medicine within its walls as to patient care—*Darling v. Charleston Community Memorial Hospital, supra;* and (4) a duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for the patients—*Wood v. Samaritan Institution,* 26 Cal.2d 847, 161 P.2d 556 (Cal.Ct. App. 1945)." *Id.* at 339-40, 591 A.2d at 707.

Justice Zapalla, writing for the majority, noted that this was an "emerging trend." *Id.* at 340, 591 A.2d at 707. The court's primary justification is bottomed on the changing role of the hospital within society. The doctrine appears to have originated in *Darling v. Charleston Memorial Hospital,* 33 Ill.2d 326, 211 N.E.2d 253 (1965). There, following a jury verdict in a medical malpractice case, the defendant argued to the Illinois Supreme Court that the trial court should not have allowed the jury to consider evidence of the state licensing commission's regulations, the accreditation board's regulations, and the hospital's own by-laws in determining the duty owed to the patient by the hospital. In rejecting this argument, the Illinois Supreme Court reasoned that the community standard which the defendant advanced embodied the notion that the hospital did not undertake to treat its patient. The court then stated that the limited view of the hospital's duty no longer reflected fact: "Present-day hospitals, as their manner of operation demonstrates, do far more than furnish facilities for treatment." *Id.,* 211 N.E.2d at 257. The court also recognized that the person who avails himself of the hospital facilities expects that the hospital will attempt to cure him. *Id.* Thus, corporate negligence serves the purpose of enforcing the legitimate expectations of members of the public.

"In addition to recognizing that individuals frequently look to the hospitals to provide treatment, corporate

negligence assigns tort liability in accordance with actual practice. Modern hospitals normally operate as businesses accepting fees for services, thereby eliminating the rationale that patients, as the objects of charity, should not recover from charitable trusts. Essentially, this reason, which initially justified immunity in favor of hospitals, has ceased to exist. This was implicitly recognized by the *Thompson* court. Hospitals have evolved into highly sophisticated corporations operating primarily on a fee-for-service basis. The corporate hospital of today has assumed the role of a comprehensive health center with responsibility for arranging and coordinating the total health care of its patients." Vol. 30, Duquesne L. Rev., 643, 644.

There is a lower court opinion directly on point from Bradford County where The Honorable John C. Mott held that under *Thompson v. Nason Hospital, supra,* the securing of informed consent was actionable against a hospital:

"The Hospital and Medical Center argue that a hospital should not 'interfere with the medical relationship between a physician and his patient,' and that 'hospitals cannot be liable for failure to obtain informed consent or to ascertain whether informed consent has been obtained.' (Brief of defendants, p. 3.) During oral argument, it was suggested that the *Nason Hospital* decision should not be applied in the context of informed consent litigation. The court disagrees.

"As stated above, the *Nason Hospital* holding applies the 'corporate liability' theory to four general areas. The third and fourth categories are particularly important with respect to the case at bar. The securing of informed consent to medical procedures is directly related to a duty to oversee all persons who practice medicine within the hospital's walls as to patient care. Likewise, it is

in the hospital's power to formulate rules insuring quality care, and these rules can include rules governing informed consent. Given the existence of these duties to supervise medical practitioners and to formulate and enforce rules to ensure quality care, as enunciated in the *Nason Hospital* case, the court concludes that the Hospital and Medical Center had a duty to the plaintiffs in the instant case with respect to informed consent. Accordingly, Count VI of the complaint, which alleges a breach of this duty, must stand." *Campana v. Robert Packer Hospital,* no. 90-CV000612 (slip opinion, August 29, 1991).

In the case at bar, defendant Silver performed non-emergency surgery on Mrs. Tuttle at defendant Polyclinic Medical Center which would render her sterile. The complaint alleges that defendant Polyclinic Medical Center, through its staff, was aware of the traumatic birth and death of baby Tuttle, that Donna's "consent" to the sterilizing procedure shortly after discussing her son's autopsy, and although not cognizant of the emotional trauma experienced by Mrs. Tuttle, defendant Polyclinic Medical Center allowed a staff physician, defendant Silver, to perform a radical sterilization procedure on Mrs. Tuttle without her informed consent.

Defendants cite a number of cases in support of the proposition that a cause of action for failure to obtain informed consent is only applicable to physicians. However, all but one of the cases relied on was decided before the court in *Thompson, supra,* recognized the "corporate negligence" theory of liability against hospitals. The only current case law cited by the defendants is that of *Wu v. Spence,* 413 Pa. Super. 352, 356, 605 A.2d 395, 397 (1992). However, the issue addressed by the court in *Spence* was whether a physician, not a hospital, was required to inform patients of the possible

adverse consequences of drug therapy. Though the court determined that there was no cause of action for failure of the physician to obtain informed consent, it did opine that perhaps the Supreme Court should adopt a negligence standard on the issue of informed consent.

In conclusion, we agree with the Bradford County decision that the alleged facts could fit within the hospital's duty to oversee all persons who practice medicine and within a duty to formulate and enforce adequate rules to ensure quality care for the patients. The certainty required for sustaining a demurrer appears to be lacking in view of this new theory of corporate negligence whose boundaries the appellate courts have not yet had an opportunity to define.

Accordingly, we enter the following:

ORDER

And now, June 25, 1993, defendants' preliminary objections are dismissed.