Robert S. WATKINS, Appellant,

v.

HOSPITAL OF the UNIVERSITY OF
PENNSYLVANIA, PENN HEALTH
SYSTEMS, Appellee.

Superior Court of Pennsylvania.

Argued April 28, 1999.
Filed July 23, 1999.
Reargument Denied Aug. 6, 1999.

Robert E. Slota, Bryn Mawr, for appellant.

Veronica N. Olszewski, Philadelphia, for appellee.

Before DEL SOLE, MONTEMURO *, JJ., and CIRILLO, President Judge Emeritus.

MONTEMURO, J.:

¶ 1 This is an appeal from an order granting the summary judgment motion of Appellees, Hospital of the University of Pennsylvania and Penn Health Systems, in an action for negligence and lack of informed consent.

¶ 2 At the age of two, Appellant, now 36, was diagnosed with Ollier's disease, a rare disorder of the skeletal system which produces multiple benign cartilaginous lesions, leaving the bones brittle and susceptible to breakage. The disease eventuated in the amputation of Appellant's right foot in 1975, as well as surgical procedures on, *inter alia*, his left ankle and his wrist. Appellant has also suffered from a heart murmur since infancy, and was in recent years diagnosed with high blood pressure. He has been in a wheel chair since 1985, and underwent surgery in 1987 for removal of a benign cartilaginous growth in his brain.

¶ 3 In 1994, Appellant was referred to Dr. Robert Zager, a neurosurgeon on staff at Appellee Hospital, for treatment of a previously diagnosed brain tumor. Because the symptoms with which Appellant presented to Dr. Zager had been accompanied by skin lesion[1] characteristic of a different disease, the overall diagnosis of his condition was changed from Ollier's disease to Maffucci's syndrome. The two are similar except that Maffucci's, another rare genetic disorder which also produces multiple tumors, is more frequently associated with malignancies than is Ollier's. The tumor for which Appellant sought

---

* Retired Justice assigned to Superior Court.

1. A tumor had been removed from Appellant's nose sometime prior to his seeing Dr. Zager.

treatment from Dr. Zager was a large mass malignancy displacing the brain stem. It occurred at the same site as the 1987 growth, although that tumor was a non-malignant lesion of a different type.

¶ 4 In August of 1994, when a craniotomy was performed to reduce the tumor,[2] a 5–6 cm. bone flap excised in the 1987 surgery was again removed, and the surgical site was further enlarged by the excision of small pieces of Appellant's temporal bone. The bone flap was to be stored in a freezer under sterile conditions, ready for reimplantation after post-operative swelling had subsided; the extension area from which the remaining bone fragments had been removed would not be recovered by bone but by the temporal muscle. When the bone flap was retrieved, however, it was found to have been contaminated; therefore a piece of titanium mesh was placed over the surgical site.

¶ 5 In October of 1996, Appellant commenced the instant action, claiming that Appellees had negligently failed to preserve the bone flap, and that as a result he had suffered permanent disfigurement, pain, depression and a pathological fear of brain injury. The complaint also asserted that he had been subjected to a battery because he had never been informed that loss of the bone flap was a risk inherent in the surgery.

¶ 6 In July of 1998, Appellees sought summary judgment on the basis that Appellant had never provided an expert report with which to prove his case. Appellant's August 5 reply to the summary judgment motion asserted that the reason for the absence of such a report was Appellees' refusal to cooperate with his discovery requests. Nevertheless, the reply was accompanied by a report dated July 30, 1998. The trial court held the motion in abeyance, and extended the period during which Appellant might file a supplementary expert report. He did so on Oc-

tober 9, 1998. On October 28, the motion for summary judgment was granted, and this appeal followed.

In reviewing a grant of summary judgment, an appellate court may disturb the order of the trial court only where there has been an error of law or manifest abuse of discretion. Nevertheless, the scope of review is plenary; the appellate court shall apply the same standard for summary judgment as the trial court ...

The record is to be viewed in the light most favorable to the nonmoving party, and all doubts as to the presence of a genuine issue of material fact must be resolved against the moving party.

*Albright v. Abington Memorial Hospital,* 548 Pa. 268, 279–80, 696 A.2d 1159, 1165 (1997) (citations omitted).

¶ 7 Pa.R.C.P. 1035.2 provides that:

After the relevant pleadings are closed but within such time as not to unreasonably delay trial, any party may move for summary judgment in whole or in part as a matter of law

(1) whenever there is no genuine issue of material fact as to a necessary element of the cause of action or defense which could be established by additional discovery or expert report, or ·

(2) if, after the completion of discovery relevant to the motion, including the production of expert reports, an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action or defense which in a jury trial would require the issues to be submitted to a jury.

The proof required for a *prima facie* showing of negligence is that a duty was owed and breached, the breach was the cause of the injury, and damages result-

---

**2.** There is no claim of negligence with respect to the surgery. Three other inoperable brain

tumors from which Appellant suffered at the same time were treated by radiation therapy.

ed from the harm thus caused. *Mitzel-felt v. Kamrin,* 526 Pa. 54 62, 584 A.2d 888, 891 (1990). Where the alleged negligence is medical in nature, the plaintiff must present evidence from an expert "who will testify, to a reasonable degree of medical certainty, that the acts of the physician deviated from good and acceptable· medical standards, and that such deviation was the cause of the harm suffered." *Id.* at 62, 584 A.2d at 892.

*Checchio v. Frankford Hospital,* 717 A.2d 1058, 1060 (Pa.Super.1998).

¶ 8   We also note our Supreme Court's recognition that

> the mere occurrence of an injury does not prove negligence, and that an admittedly negligent act does not necessarily entail liability; rather even when it is established that the defendant breached some duty of care owed the plaintiff, it is incumbent upon a plaintiff to establish a causal connection between defendant's conduct and the plaintiff's injury.

*Hamil v. Bashline,* 481 Pa. 256, 265, 392 A.2d 1280, 1284 (1978).

¶ 9   Appellant first argues that no expert report was necessary in this matter because his injuries are "the obvious, immediate and natural consequences of the negligent event." (Appellant's brief at 2). He also insists that even were such expert opinion required, he has provided it.

¶ 10   The logical progression Appellant espouses is as follows: because the bone flap was contaminated and rendered useless through Appellees' negligence, a titanium insert was used to cover the surgical field; Appellant now suffers from disfigurement, headaches and depression; therefore, the cause of Appellant's injuries is the titanium mesh which was substituted for the bone flap because of Appellees' negligence. Citing cases which stand for the·proposition that lay testimony is sufficient to establish a causal connection between an event and an injury when the connection is obvious, *cf. Lattanze v. Sil-verstrini,* 302 Pa.Super. 217, 448 A.2d 605 (1982), Appellant's argument is predicated on the assumption that the photographs appended to his answer to Appellee's Motion for Summary Judgment, and his own deposition testimony, make the connection obvious.

¶ 11   The problem here is that only the disfigurement is obvious in the sense that it is observable. Thus, the repercussions claimed to have proceeded from the substitution of titanium for bone must be examined separately. There is no question of the direct link between the loss of the bone flap and the conspicuous depression in Appellant's skull; the damage is immediately apparent to the most casual observer. Accordingly, this aspect of Appellant's claim should not have been subject to summary judgment. The other consequences urged by Appellant as a product of the loss of the bone flap are more problematical, and require a different analysis.

¶ 12   While it is believable and even logical that he suffers pain, depression and fear, the source of these problems is not self evident; credibility does not lead ineluctably to a finding of causation, nor does it prove that the injuries would not have been sustained absent negligence on Appellee's part in handling the bone flap. *See Hamil, supra.*

¶ 13   While the photographs make clear that Appellant does indeed suffer from a facial deformity, even accepting as true his accounts of his pain, medical testimony is nevertheless necessary to demonstrate a causal link between the substitution of titanium mesh for bone and the observed and reported effects of such substitution. Without expert assessment, attributing the headaches Appellant now complains of to the titanium insert is purely speculative. The headaches existed prior to the surgery, and the current pain might as easily have resulted from the remaining tumors with which Appellant is afflicted, from the radiation Appellant received to treat them, or from repeated surgery on his brain. Further, when Appellant mentioned to Dr.

Zager his fear that the insert would not have been as protective as bone, he was told there was no reason why it would not be.

¶ 14 Appellant also suffers from hemiparesis on his left side, attributable to the tumor, for which he receives physical therapy. As a result of the weakness, some normal activities in which he had been accustomed to engage are no longer available to him. In addition, there is no function in his right eyelid, which also affects his appearance.[3] Such limitations are a reasonable alternative basis for depression. Thus the connection between any negligence on Appellees' part and the injuries is, in fact, not as obvious as Appellant would have us believe. Speculative causality is insufficient to defeat a motion for summary judgment. It is at this juncture that the content of Appellant's expert reports becomes critical.

¶ 15 The reports were prepared by Dr. Roger Farber, a neurologist. The first report recites Appellant's complaints, pain and depression over the appearance of his head, and supplies the following analysis:

He does have significant obvious problems here and the problems I think are mainly related to his reaction to appearing very unusual with this depressed flap. There is no question that the titanium was necessary to maintain him and allow him to function as he is now, but psychiatrically his reaction is one of obvious dismay and depression to having this. I think this is the major problem. The pain problem is another problem that is present and is one that I think he is living with and has to live with on an indefinite basis.

It is difficult for me, at this point, to figure a way around working with his major depression. One obviously can't get the percentage divided up from the tumor surgery and the hemiparesis and

also then from the cosmetic defect, but that is a substantial one.

(Report of July 30, 1998).

¶ 16 The second report, reads in pertinent part as follows:

There is no question that he has a cosmetic defect from the use of the mesh, as opposed to his bone flap. His own response to this obvious cosmetic defect was one of dismay and he did have an obvious psychiatric reaction to this.

(Report of September 14, 1998).

¶ 17 Appellant is correct in pointing out that no magic words are required to demonstrate causation; the reasonable degree of medical certainty essential for acceptance of an expert's opinion, *Mitzelfelt, supra*, must be amenable to extrapolation from the expert's report. What the expert must demonstrate is that the negligence of the defendant either proximately caused the plaintiff's harm, or increased the risk of its occurrence. *See id.* Most crucial here is that when establishing a *prima facie* case, the plaintiff need not exclude every possible source of the harm other than defendant's negligence. *Hamil*, 481 Pa. at 266, 392 A.2d at 1285. *See also McDonald v. Aliquippa Hospital*, 414 Pa.Super. 317, 606 A.2d 1218, *appeal denied*, 532 Pa. 646, 614 A.2d 1142 (1992). "It is enough that reasonable minds are able to conclude that the preponderance of the evidence shows defendant's conduct to have been a substantial cause of the harm to the plaintiff." *Hamil*, 481 Pa. at 266, 392 A.2d at 1285. Once the plaintiff has established the defendant's conduct as a source of his injury, the fact finder must determine whether indeed defendant's conduct was a substantial factor in bringing about the harm.

¶ 18 Although *Hamil* and *McDonald* employed this reduced certainty principle for use at a different stage of the proceedings than is the situation here, it

**3.** There were already depressions in Appellant's skull resulting from burr holes drilled during the 1987 cranial surgery.

applies nevertheless, and is perhaps more germane given the less stringent proof required to allow a question to evade summary disposition. "The quantum of evidentiary facts which must be adduced to preclude summary judgment is not the same as that required at trial." 6 *Standard Pennsylvania Practice* § 32:99. Thus Appellant is not, to avoid summary judgment, required to prove the risk to his mental health was posed only by the Appellee's negligence in contaminating the skull flap. It is left to the jury to apportion liability for the injuries because the explicit content of Dr. Farber's report does not permit us to countenance summary dismissal of his comments. The report presents, albeit somewhat infelicitously expressed, an opinion directly connecting Appellees' negligence in failing to preserve the bone flap with the deterioration in Appellant's mental condition stemming from his disfigurement. Indeed, the report makes clear that while there is no way of quantifying what has affected him more, possible causes readily available: the tumor surgery, to which Appellant has conceded there was no alternative; the hemiparesis, which is not even discussed in Appellant's action other than during his deposition, or the disfigurement resulting from the substitution of mesh for bone. Dr. Farber states unequivocally, however, that the contribution of the cosmetic defect to Appellant's depressed state of mind is "a substantial one." That Appellant is suffering is beyond all doubt, and although Appellees' causative role is not specifically defined, Dr. Farber provides the necessary degree of medical certainty as to Appellees' contribution to the risk of such harm as actually occurred. Under these circumstances we find that the trial court abused its discretion in ruling that no *prima facie* case has been made on this issue, and that no genuine issues of material fact exist with respect to the depression.

¶ 19 The pain and fear of which Appellant complains, while also believable, are different matters altogether in terms of his *prima facie* case. There is no reference in the expert's report to any etiology for either of these conditions; indeed, only the presence of Appellant's discomfort is mentioned. The pain and fear are not necessarily linked either to replacement of the bone flap with mesh or with the depression, either as causes or effects. There is, in fact, nothing supplied to counter the possible alternatives: the surgery itself, the remaining tumors, or the effects of radiotherapy. Unsupported assertions simply do not create genuine issues of material fact. Accordingly, summary judgment was properly entered on these elements of Appellant's case.

¶ 20 Finally, Appellant argues that because Dr. Zager failed to inform him of the possibility that the bone flap might be destroyed, his consent to surgery was not informed, and the surgery was a technical battery. As Dr. Zager's employer, Appellant contends, Appellees are thus vicariously liable for the damages attendant upon the technical battery which the surgery constituted.

¶ 21 In reaching this conclusion, Appellant relies upon this court's holding in *Friter v. Iolab Corporation*, 414 Pa.Super. 622, 607 A.2d 1111 (1992). His reliance is misplaced. There a panel of this Court found an exception to the general rule that there is no independent duty for a non-physician to obtain a patient's informed consent. *Southard v. Temple University Hospital*, 731 A.2d 603 (Pa.Super.1999); *Kelly v. Methodist Hospital*, 444 Pa.Super. 427, 664 A.2d 148 (1995). Normally, only the physician has such a duty as it is he/she who performs the non-consensual touching which constitutes a battery where consent to the surgical procedure is uninformed. In *Friter*, however, the hospital was involved in an clinical investigation for the Federal Drug Administration. Federal regulations bound the hospital, as an institution approved for participation in the study, to obtain an informed consent from any patient undergoing experimental treatment. The hospital thus assumed an

independent duty which it would not ordinarily bear. There is no factual analog to be found in the instant case. Accordingly, as the trial court correctly found, the general rule controls here, and no liability for lack of informed consent attaches.

¶ 22 Order affirmed in part and reversed in part. Case remanded for proceedings consistent with this Opinion.

¶ 23 Concurring and Dissenting Statement by DEL SOLE, J.

DEL SOLE, J., concurring and dissenting:

¶ 1 I join the Majority Opinion in all respects save one. I disagree that Appellant has not raised sufficient facts to establish a *prima facie* claim for damages related to pain and fear as a result of defendant's negligence. Appellant's testimony is sufficient to permit these claims to be considered by the jury. The lack of references in the experts' reports may result in the jury rejecting the claims. The subjective nature of pain and suffering claims allows the plaintiff's testimony to be sufficient to submit the issue to the jury.