IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
August 8, 2017 Session

## WASHINGTON COUNTY SCHOOL SYSTEM BY AND THROUGH THE WASHINGTON COUNTY BOARD OF EDUCATION ET AL. v. THE CITY OF JOHNSON CITY, TENNESSEE

**Interlocutory Appeal from the Chancery Court for Washington County
No. 42491     E. G. Moody, Chancellor**

---

**No. E2016-02583-COA-R9-CV**

---

This is one of four separate actions currently before this Court with the common issue of whether the version of Tennessee Code Annotated § 57-4-306(a)(2)(A) in effect prior to the July 2014 amendment of that statute required a municipality governed by its own liquor-by-the-drink referendum and operating its own school system to share one-half of its liquor-by-the-drink tax revenue with the county in which the municipality was located when the county had not enacted a liquor-by-the-drink referendum. The county commenced the instant action by filing a complaint requesting declaratory judgment of its asserted right to a portion of liquor-by-the-drink tax revenue collected within the municipality. The city filed a motion to dismiss the complaint, or in the alternative, for summary judgment. Following a hearing, the trial court denied the municipality's motion for summary judgment and granted declaratory judgment to the county, declaring that the municipality was required to share with the county its liquor-by-the-drink tax monies distributed to it by the Tennessee Commissioner of Revenue ("the Commissioner") in the manner that county property tax was expended and distributed. The trial court reserved issues of prejudgment interest and the amount of unremitted tax revenue for an evidentiary hearing. The municipality subsequently filed an unopposed motion for interlocutory appeal, which was granted, respectively, by the trial court and this Court. Determining that the municipality was not required under the applicable version of the statute to share its liquor-by-the-drink tax revenue with the county, we reverse the trial court's grant of declaratory judgment and grant summary judgment in favor of the municipality, dismissing the county's complaint.

**Tenn. R. App. P. 9 Interlocutory Appeal; Judgment of the Chancery Court
Reversed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and RICHARD H. DINKINS, J., joined.

K. Erickson Herrin, Johnson City, Tennessee, for the appellant, The City of Johnson City, Tennessee.

James F. Logan, Jr., Cleveland, Tennessee, for the appellees, Washington County School System, by and through the Washington County Board of Education, and Washington County, Tennessee.

## OPINION

### I. Factual and Procedural Background

The facts underlying this action are essentially undisputed. Tennessee Code Annotated § 57-4-301(c) (2013 & Supp. 2017) provides for a tax "to include each and every retail" of an alcoholic beverage sold for consumption on the premises by various establishments delineated in section -301, such as restaurants, hotels, sports facilities, and private clubs. This tax is commonly referred to as a "liquor-by-the-drink tax." *See* Tenn. Code Ann. § 57-4-306 (2013 & Supp. 2017); *Copper Cellar Corp. v. Jackson*, 762 S.W.2d 560, 562 (Tenn. 1988). Tennessee Code Annotated § 57-4-306, originally enacted in 1967, prescribes the manner in which proceeds from the liquor-by-the-drink tax are to be distributed, primarily in support of public education. At issue in this action is the version of section -306 in effect prior to the Tennessee General Assembly's 2014 amendment of that statutory section ("2014 Amendment"). *See* 2014 Tenn. Pub. Acts, Ch. 901 § 1 (H.B. 1403). Particularly at issue is statutory language added to subsection -306(a)(2)(A) through an amendment made by the General Assembly in 1982 ("1982 Amendment"). *See* 1982 Tenn. Pub. Acts, Ch. 942, §§ 1-2 (S.B. 1817).

The City of Johnson City ("the City") passed a liquor-by-the-drink referendum in 1980. The citizens of Washington County ("the County") had never had such a referendum put before them at the time this action was commenced. As the trial court noted, the City had continuously operated its own school system since at least the 1967 enactment of the liquor-by-the-drink statutory scheme by the General Assembly. Since passage of the 1980 referendum, the City had received fifty percent of gross receipt taxes arising from sales of liquor by the drink. The City had not distributed any of its liquor-by-the-drink revenue to the Washington County School System or to Washington County generally. Simultaneously, within the unincorporated areas of the County, private clubs had legally sold alcohol for consumption on the premises through the time this action was commenced. The Commissioner had distributed one-half of those funds to the County, which in turn distributed one-quarter (or one-half of the half it had received) among the school systems in the County, including the City's school system.

On May 2, 2014, the Washington County School System ("the County School System"), acting by and through the Washington County Board of Education ("the County Board"), filed a complaint in the Washington County Chancery Court ("trial court"), seeking declaratory judgment regarding the rights and responsibilities of the parties concerning the liquor-by-the-drink tax. The County Board requested, *inter alia*, an order directing the City to remit to the County Board the "full amount of unremitted tax revenues" plus prejudgment interest.

On June 27, 2014, the City filed a motion to dismiss the complaint or, in the alternative, for summary judgment. The City asserted, as pertinent to this appeal, that (1) the County Board's complaint failed to state a claim upon which relief could be granted pursuant to Tennessee Rule of Civil Procedure 12.02(6), (2) Tennessee Code Annotated § 57-4-306(a) (2013) did not operate to require the City to remit any part of its portion of liquor-by-the-drink tax proceeds received from the Commissioner to the County's school system, and (3) Title 57, Chapter 4 of the Tennessee Code was not applicable to the County because the County had not authorized liquor-by-the-drink sales. In support of the latter argument, the City contended that because the County had not authorized liquor-by-the-drink sales, all of Title 57, Chapter 4, including section -306, did not apply to the County. *See* Tenn. Code Ann. § 57-4-103(a) (2013 & Supp. 2017) ("This chapter shall be effective in any jurisdiction which authorizes the sale of alcoholic beverages for consumption on the premises in a referendum . . . .").

In its motion to dismiss, the City also asserted that the County Board lacked the capacity to commence and maintain this lawsuit against the City. The County Board filed a response on November 12, 2014, requesting denial of the City's motion. The parties subsequently filed additional pleadings and exhibits concerning the City's motion, including, as attached to a pleading filed by the City, a copy of the legislative history surrounding the 1982 Amendment. On April 28, 2015, the County filed a petition to intervene as a co-plaintiff, and the County Board filed a motion the following day, seeking to amend the complaint to add the County as a co-plaintiff. The City filed responses objecting to the County's intervention and the amendment of the complaint. Following a hearing, the trial court entered an order on June 1, 2015, granting the motion to intervene and the motion to amend the complaint, with the effect of joining the County with the County Board as joint plaintiffs. We will hereinafter refer to the plaintiffs collectively as "the County."

On June 15, 2015, the City filed a motion to alter or amend the judgment that allowed the County to intervene. On February 16, 2016, the City filed an answer to the County's amended complaint and a renewed motion to dismiss or, in the alternative, for summary judgment. In its answer, the City also renewed its motion to alter or amend the judgment allowing the County's intervention. Also on February 16, 2016, the parties

filed an agreed notice of hearing for all pending motions. The County subsequently filed a response to the City's motion for summary judgment, and the City filed a reply.

In the meantime, the General Assembly amended Tennessee Code Annotated § 57-4-306(a)(2), effective July 1, 2014, setting forth, *inter alia*, a detailed process by which counties that were owed funds by municipalities under Tennessee Code Annotated § 57-4-306 could seek those funds and negotiate settlements as applicable. *See* 2014 Tenn. Pub. Acts, Ch. 901 § 1 (H.B. 1403). The 2014 Amendment included a distinction between the liquor-by-the-drink tax proceeds received by a local political subdivision in the time period spanning July 1, 2014, until June 30, 2015, and those proceeds received after July 1, 2015, when, according to the 2014 Amendment, the statute would revert back to its pre-amendment language. *See* Tenn. Code Ann. § 57-4-306(b)-(c) (Supp. 2014); 2014 Tenn. Pub. Acts, Ch. 901 § 1 (H.B. 1403). However, the General Assembly has also amended Tennessee Code Annotated § 57-4-306 each year since the 2014 Amendment, extending the amended language in subsequent years, one year at a time. *See* 2015 Tenn. Pub. Acts, Ch. 220 §§ 1, 2 (S.B. 990); 2016 Tenn. Pub. Acts, Ch. 885 §§ 1, 2 (H.B. 1691); 2017 Tenn. Pub. Acts, Ch. 346 §§ 1, 2 (S.B. 1262). In this action, the City attached a copy of the legislative history surrounding the 2014 Amendment to its reply to the response filed by the County to the City's motion for summary judgment.

Following a hearing conducted on March 8, 2016, the trial court entered an order on October 27, 2016, granting declaratory judgment in favor of the County, denying the City's motion for summary judgment, and directing the City to pay the County unremitted liquor-by-the-drink tax revenue in the same manner as the county property tax was distributed. The court specifically found that the language of Tennessee Code Annotated § 57-4-306(a)(2)(A) (2013) and the meaning of "jurisdiction" as it was used in Tennessee Code Annotated § 57-4-103(a)(1) were ambiguous. The court then examined the legislative history of the 2014 Amendment but made no reference in its order to the legislative history underlying the 1982 Amendment that effected the governing version of subsection -306(a)(2)(A). Although the court found the legislative history surrounding the 2014 Amendment to be "ambiguous" in terms of determining the General Assembly's intent, the court agreed "with the County's argument that it would be counterintuitive for the legislature to codify a remedial measure allowing an 'aggrieved' county school board to recover Consumption Tax proceeds from a municipality operating its own school system if the legislature never intended such an outcome."

The trial court went on to find that because "there are ambiguities in both the statute and in the legislative history, the Court must consider public policy concerns." The court concluded in pertinent part:

4

> [P]ublic policy and the principles of equity and fairness demand that students across the State receive essentially the same education opportunities whether they attend City or County schools. Any other result would be inequitable, unjust and against a well settled public policy of equal education opportunities for all students in the State.

The court also found that principles of equity favored the County's argument because the County had consistently expended and distributed the liquor-by-the-drink sales taxes it received from the Commissioner for private club sales to all schools in the County in the manner that the county property tax for schools was expended and distributed. The court reserved issues regarding prejudgment interest and the amount of unremitted tax revenue for an evidentiary hearing.

During the March 2016 hearing, the City raised a constitutional argument, positing that if the trial court were to adopt the County's interpretation of Tennessee Code Annotated § 57-4-306(a) (2013) and hold that a privilege tax collected in the Cities should have benefitted citizens of another jurisdiction, such a holding would render the statute in violation of Article II, Section 29 of the Tennessee Constitution.[1] Maintaining that public education is a "State function," the trial court found that "Article II, Section 29 of the Tennessee Constitution does not apply."

The City filed an unopposed motion for interlocutory appeal on December 2, 2016, which was granted by the trial court in an order entered December 29, 2016. The trial court noted in its order that other cases with the same issue of statutory interpretation were scheduled for appeal before this Court. This Court subsequently granted permission for interlocutory appeal. Upon a motion to consolidate filed by the appellants in a separate action sharing the same overarching question of statutory interpretation, this Court entered an order on May 26, 2017, granting the motion "only to the extent that these cases shall be set for oral argument on the same docket and on the same day."[2]

---

[1] Article II, Section 29 provides in pertinent part:

> The General Assembly shall have power to authorize the several counties and incorporated towns in this state, to impose taxes for county and corporation purposes respectively, in such manner as shall be prescribed by law; and all property shall be taxed according to its value, upon the principles established in regard to state taxation.

[2] The other three cases currently before this Court on the same overarching issue are *Bradley Cty. Sch. Sys. by and through the Bradley Cty. Bd. of Educ. v. City of Cleveland*, No. E2016-01030-COA-R3-CV; *Sullivan Cty. v. City of Bristol*, No. E2016-02109-COA-R3-CV; and *Blount Cty. Bd. of Educ. v. City of Maryville*, No. E2017-00047-COA-R3-CV.

## II. Issues Presented

Pursuant to Tennessee Rule of Appellate Procedure 9, "we are limited on appeal to the questions certified by the trial court in its order granting permission to seek an interlocutory appeal and in this Court's order granting the appeal." *In re Bridgestone/Firestone & Ford Motor Co. Litig.,* 286 S.W.3d 898, 902 (Tenn. Ct. App. 2008). This Court directed in its order granting interlocutory appeal that the issues would be as certified by the trial court in its order granting interlocutory review. We note, however, that the trial court in its order did not expressly state the issues certified for review. The trial court did provide a detailed rationale for approving interlocutory review, referencing the other cases currently before this Court involving interpretation of the pre-2014 version of Tennessee Code Annotated § 57-4-306(a) and the need for appellate review of differing trial court decisions. We therefore summarize the issues before us as in the other three cases currently before this Court on the same overarching question of statutory interpretation. As such, this Court has granted an interlocutory appeal in the instant action to address the following issues:

1. Whether the trial court erred by finding that the version of Tennessee Code Annotated § 57-4-306(a)(2)(A) in effect prior to the 2014 Amendment required the City, as a municipality governed by its own liquor-by-the-drink referendum and operating its own school system, to share one-half of its liquor-by-the-drink tax revenue with the County when the County had not enacted a liquor-by-the-drink referendum.

2. Whether the trial court erred by finding that the pre-2014 version of Tennessee Code Annotated § 57-4-306(a)(2) required that one-half of all liquor-by-the-drink sales tax revenue received by the City must be distributed in support of education in the same manner as the County property tax is distributed.[3]

---

[3] We note that in its motion for interlocutory appeal, Johnson City requested review of the issues addressed by the trial court in its October 2016 order, which included a section entitled "Summary of the Issues," stating the following:

1. Is the statutory language in Tenn. Code Ann. § 57-4-306 ambiguous?
2. Does requiring Johnson City to disburse a portion of the proceeds from the Consumption Tax to the County violate Article II, Section 29 of the Tennessee Constitution?
3. Does Washington County's lack of a referendum, authorizing liquor-by-the-drink sales, disqualify it from receiving its statutory share of the revenues generated by liquor-by-the-drink sales pursuant to Tenn. Code Ann. § 57-4-306?

## III. Standard of Review

The issue raised in this interlocutory appeal is a question of law. We review questions of law, including those of statutory construction, *de novo* with no presumption of correctness. *See Cunningham v. Williamson Cnty. Hosp. Dist.,* 405 S.W.3d 41, 43 (Tenn.2013) (citing *Mills v. Fulmarque, Inc.,* 360 S.W.3d 362, 366 (Tenn. 2012)). The trial court in this action granted declaratory judgment in favor of the County. Tennessee's Uniform Declaratory Judgment Act provides, *inter alia,* that any person "whose rights, status, or other legal relations are affected by a statute . . . may have determined any question of construction or validity arising under the . . . statute . . . and obtain a declaration of rights, status or other legal relations thereunder." Tenn. Code Ann. § 29-14-103 (2012). Although Tennessee Code Annotated § 29-14-108 (2012) provides for the determination of an issue of fact within an action for declaratory judgment, "ideally and ordinarily" such an action does not invoke disputed issues of fact. *See Goodwin v. Metro. Bd. of Health,* 656 S.W.2d 383, 387 (Tenn. Ct. App. 1983). To the extent that we may need to review the factual findings of the trial court, we presume those findings to be correct and will not overturn them unless the evidence preponderates against them. *See* Tenn. R. App. P. 13(d); *Morrison v. Allen,* 338 S.W.3d 417, 425-26 (Tenn. 2011).

The trial court also denied the City's motion for summary judgment. The grant or denial of a motion for summary judgment is a matter of law; therefore, our standard of review is *de novo* with no presumption of correctness. *See Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 250 (Tenn. 2015); *Dick Broad. Co., Inc. of Tenn. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 671 (Tenn. 2013) (citing *Kinsler v. Berkline, LLC*, 320 S.W.3d 796, 799 (Tenn. 2010)). As such, this Court must "make a fresh determination of whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied." *Rye*, 477 S.W.3d at 250. "Statutory construction is a question of law that is reviewable on a de novo basis without any presumption of correctness." *In re Estate of Tanner*, 295 S.W.3d 610, 613 (Tenn. 2009).

As our Supreme Court has explained concerning the requirements for a movant to prevail on a motion for summary judgment pursuant to Tennessee Rule of Civil Procedure 56:

> We reiterate that a moving party seeking summary judgment by attacking
> the nonmoving party's evidence must do more than make a conclusory

We determine that these issues are included in analysis of the overarching issues presented here, as are a separate list of issues presented by the City in its principal brief on appeal.

assertion that summary judgment is appropriate on this basis. Rather, Tennessee Rule 56.03 requires the moving party to support its motion with "a separate concise statement of material facts as to which the moving party contends there is no genuine issue for trial." Tenn. R. Civ. P. 56.03. "Each fact is to be set forth in a separate, numbered paragraph and supported by a specific citation to the record." *Id.* When such a motion is made, any party opposing summary judgment must file a response to each fact set forth by the movant in the manner provided in Tennessee Rule 56.03. "[W]hen a motion for summary judgment is made [and] . . . supported as provided in [Tennessee Rule 56]," to survive summary judgment, the nonmoving party "may not rest upon the mere allegations or denials of [its] pleading," but must respond, and by affidavits or one of the other means provided in Tennessee Rule 56, "set forth specific facts" *at the summary judgment stage* "showing that there is a genuine issue for trial." Tenn. R. Civ. P. 56.06. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.,* 475 U.S. [574,] 586, 106 S.Ct. 1348 [(1986)]. The nonmoving party must demonstrate the existence of specific facts in the record which could lead a rational trier of fact to find in favor of the nonmoving party. If a summary judgment motion is filed before adequate time for discovery has been provided, the nonmoving party may seek a continuance to engage in additional discovery as provided in Tennessee Rule 56.07. However, after adequate time for discovery has been provided, summary judgment should be granted if the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the existence of a genuine issue of material fact for trial. Tenn. R. Civ. P. 56.04, 56.06. The focus is on the evidence the nonmoving party comes forward with at the summary judgment stage, not on hypothetical evidence that theoretically could be adduced, despite the passage of discovery deadlines, at a future trial.

*Rye*, 477 S.W.3d at 264-65 (emphasis in original). Pursuant to Tennessee Rule of Civil Procedure 56.04, the trial court must "state the legal grounds upon which the court denies or grants the motion" for summary judgment, and our Supreme Court has instructed that the trial court must state these grounds "before it invites or requests the prevailing party to draft a proposed order." *See Smith v. UHS of Lakeside, Inc.*, 439 S.W.3d 303, 316 (Tenn. 2014).

## IV. Distribution of Liquor-by-the-Drink Tax Revenue

The City contends that the trial court erred by finding that the version of Tennessee Code Annotated § 57-4-306(a)(2)(A) (2013) in effect prior to the 2014

8

Amendment required the City to share one-half of its liquor-by-the-drink tax revenue with the County's school system. The City asserts that the governing statute directed that because the City operated its own school system, the portion of its liquor-by-the-drink revenue not paid into the state's general education fund was to be split between the City's school system and the City itself. Upon careful review, we determine that the governing statute was ambiguous in that the distribution scheme for a city operating its own school system could be reasonably interpreted in more than one way. Having therefore analyzed the surrounding statutory scheme, the legislative history, and other applicable authorities, as well as the record in this action, we conclude that the trial court erred in determining that the City was required to share one-half of its liquor-by-the-drink tax revenue with the County's school system.

In conducting this analysis, we adhere to the following longstanding principles of statutory interpretation:

> When dealing with statutory interpretation, well-defined precepts apply. Our primary objective is to carry out legislative intent without broadening or restricting the statute beyond its intended scope. *Houghton v. Aramark Educ. Res., Inc.,* 90 S.W.3d 676, 678 (Tenn. 2002). In construing legislative enactments, we presume that every word in a statute has meaning and purpose and should be given full effect if the obvious intention of the General Assembly is not violated by so doing. *In re C.K.G.,* 173 S.W.3d 714, 722 (Tenn. 2005). When a statute is clear, we apply the plain meaning without complicating the task. *Eastman Chem. Co. v. Johnson,* 151 S.W.3d 503, 507 (Tenn. 2004). Our obligation is simply to enforce the written language. *Abels ex rel. Hunt v. Genie Indus., Inc.,* 202 S.W.3d 99, 102 (Tenn. 2006). It is only when a statute is ambiguous that we may reference the broader statutory scheme, the history of the legislation, or other sources. *Parks v. Tenn. Mun. League Risk Mgmt. Pool,* 974 S.W.2d 677, 679 (Tenn. 1998). Further, the language of a statute cannot be considered in a vacuum, but "should be construed, if practicable, so that its component parts are consistent and reasonable." *Marsh v. Henderson,* 221 Tenn. 42, 424 S.W.2d 193, 196 (1968). Any interpretation of the statute that "would render one section of the act repugnant to another" should be avoided. *Tenn. Elec. Power Co. v. City of Chattanooga,* 172 Tenn. 505, 114 S.W.2d 441, 444 (1937). We also must presume that the General Assembly was aware of any prior enactments at the time the legislation passed. *Owens v. State,* 908 S.W.2d 923, 926 (Tenn. 1995).

*In re Estate of Tanner*, 295 S.W.3d at 613-14.

A. Ambiguity of Tennessee Code Annotated § 57-4-306(a)(2)(A) (2013)

The version of Tennessee Code Annotated § 57-4-306 in effect when this action was commenced provided in pertinent part:

(a)    All gross receipt taxes collected under § 57-4-301(c) shall be distributed by the commissioner as follows:

    (1)    Fifty percent (50%) to the general fund to be earmarked for education purposes; and

    (2)    Fifty percent (50%) to the local political subdivision as follows:

        (A)    One half (½) of the proceeds shall be expended and distributed in the same manner as the county property tax for schools is expended and distributed; provided, however, that except in counties having a population of not less than twenty-seven thousand nine hundred (27,900) nor more than twenty-seven thousand nine hundred twenty (27,920), according to the 1980 federal census or any subsequent federal census, any proceeds expended and distributed to municipalities which do not operate their own school systems separate from the county are required to remit one half (½) of their proceeds of the gross receipts liquor-by-the-drink tax to the county school fund; and

        (B)    The other one half (½) shall be distributed as follows:

            (i)    Collections of gross receipts collected in unincorporated areas, to the county general fund; and

            (ii)    Collections of gross receipts in incorporated cities and towns, to the city or town wherein such tax is collected.

(b)    Notwithstanding subdivision (a)(2), the fifty percent (50%) of the gross receipt taxes allocated to local political subdivisions by

subdivision (a)(2) and collected in a municipality which is a premier tourist resort shall be distributed to and expended by such municipality for schools in such municipality.

Tenn. Code Ann. § 57-4-306 (2013).

The applicable version of Tennessee Code Annotated § 57-4-301(c) (2013), referenced in subsection -306(a), provided:

(c)     In addition to the privilege taxes levied in subdivision (b)(1), there is further levied a tax equal to the rate of fifteen percent (15%) of the sales price of all alcoholic beverages sold for consumption on the premises, the tax to be computed on the gross sales of alcoholic beverages for consumption on the premises for the purpose of remitting the tax due the state, and to include each and every retail thereof.[4]

Subsection -301(b)(1) (2013 & Supp. 2017) sets forth privilege taxes to be paid to the alcoholic beverage commission by "[e]ach applicant for an on-premises consumption license" during the application process and on an ongoing basis as the privilege is exercised, according to such criteria as the type of seller, seating capacity, and percentage of gross sales. Subsection -301(c), in both its prior and current versions, thus adds to the privilege taxes levied in -301(b)(1) the fifteen-percent, liquor-by-the-drink tax applied to alcoholic beverages consumed on the premises. Pursuant to subsection -306(a)(1), which remains unchanged since the version governing here, all of the gross receipt liquor-by-the-drink taxes are to be distributed by the Commissioner, with fifty percent allocated to the state's general fund, where they are earmarked for education purposes. Tenn. Code Ann. § 57-4-306(a)(1) (2013 & Supp. 2017). Up to this point, the clarity of section -306 is not in dispute.

At issue in this action is the second fifty percent of the gross receipt taxes, which, under the governing version of the statute, were to be distributed to the "local political subdivision." *See* Tenn. Code Ann. § 57-4-306(a)(2) (2013). Particularly at issue is the distribution of the twenty-five percent (half of the fifty percent returned to the local political subdivision by the Commissioner) as set forth in subsection -306(a)(2)(A). The phrase, "local political subdivision," is not expressly defined in Title 57, Chapter 4. In general, a "political subdivision" may be defined as "[a] division of a state that exists primarily to discharge some function of local government." BLACK'S LAW DICTIONARY

---

[4] Effective May 9, 2017, the General Assembly amended Tennessee Code Annotated § 57-4-301(c) to designate the prior version of subsection -301(c) as -301(c)(1) and add a subsection -301(c)(2). *See* 2017 Tenn. Pub. Acts, Ch. 338 § 4 (S.B. 798).

1197 (8th ed. 2004). For example, within Tennessee's Governmental Tort Liability Act, a "governmental entity" is defined in part as "any political subdivision of the state of Tennessee including, but not limited to, any municipality, metropolitan government, county, utility district, school district . . . ." Tenn. Code Ann. § 29-20-102(3)(A) (2012 & Supp. 2017) (emphasis added). Accordingly, both the City and the County are local political subdivisions of the state. However, whether the applicable version of Title 57, Chapter 4 applied to a local political subdivision that had not authorized liquor-by-the-drink sales is a separate question, which we will address in a subsequent portion of this analysis.

We note that the plain language of Tennessee Code Annotated § 57-4-306(a)(2)(B) (2013), which disposed of the final twenty-five percent of liquor-by-the-drink gross receipt taxes, is not in dispute. This subsection provided that twenty-five percent of gross receipt taxes (or fifty percent of the revenue returned to the local political subdivision by the Commissioner) would be distributed to a county's general fund if the gross receipt taxes were collected in unincorporated areas of the county and to a city or town if the gross receipt taxes were collected in that city or town. Tenn. Code Ann. § 57-4-306(a)(2)(B) (2013). The applicable version of subsection -306(b), which provided for distribution of gross receipt taxes collected in a municipality that was a premier tourist resort, as that term was defined in Tennessee Code Annotated § 57-4-102(26) (2013), is also not in dispute. The question of statutory interpretation at issue is thus narrowed to the distribution scheme set forth for twenty-five percent of the gross receipt taxes from liquor-by-the-drink revenue in subsection -306(a)(2)(A) (2013).

In the applicable version, subsections -306(a)(2)(A) and -306(a)(2)(B) were joined by a semi-colon and the coordinating conjunction, "and." Subsection -306(a)(2)(A), up to the conjunction joining it to -306(a)(2)(B), stated:

> One half (½) of the proceeds shall be expended and distributed in the same manner as the county property tax for schools is expended and distributed; provided, however, that except in counties having a population of not less than twenty-seven thousand nine hundred (27,900) nor more than twenty-seven thousand nine hundred twenty (27,920), according to the 1980 federal census or any subsequent federal census, any proceeds expended and distributed to municipalities which do not operate their own school systems separate from the county are required to remit one half (½) of their proceeds of the gross receipts liquor-by-the-drink tax to the county school fund; . . . .

The paragraph began with an independent clause, ending with the first semi-colon, which provided: "One half (½) of the proceeds shall be expended and distributed in the same

12

manner as the county property tax for schools is expended and distributed; . . . ." This statement, which stood as its own sentence prior to the 1982 Amendment, was linked in the applicable version to an additional clause by the semi-colon, beginning with "provided, however that . . . ."

The County posits, and the trial court agreed, that the semi-colon preceding "provided" indicates that the clause added by the 1982 Amendment was a clarification of the preceding sentence. We note that when the 1982 Amendment was approved by the General Assembly, "provided" began a new sentence and that the punctuation was subsequently changed to a semi-colon, apparently during codification of the 1982 Amendment. However, we find this distinction immaterial to analysis of the statute. The meaning of "provided," as it was utilized here as a conjunction, is "[o]n the condition or understanding (that)." *See* BLACK'S LAW DICTIONARY at 1261-62. Combined with "however," "provided" functioned as a conjunctive adverbial phrase, with the standard function of "join[ing] two clauses and indicat[ing] the relationship between them." *See generally* BRYAN A. GARNER, THE REDBOOK, A MANUAL ON LEGAL STYLE, 207 (3d ed. 2013).

A semi-colon, when utilized in its non-listing function, separates two independent but related clauses and, as the County notes, "generally signals addition or contrast." *See* CHERYL GLENN & LORETTA GRAY, HODGES' HARBRACE HANDBOOK 63 (16th ed. 2007). Of course, a period also separates independent clauses, but one sentence does not follow another in a vacuum. In this instance, the amended language began with the conjunctive adverbial phrase, "provided, however," which through its meaning connected the proviso to the clause preceding it, whether that connection was signaled by a semi-colon, as in the printed version of the amended statute, or simply through the neighboring proximity of two sentences and context of those sentences, as in the version of the 1982 Amendment passed by the legislature. The phrase, "provided, however," was followed by the nominalizer, "that," signaling what was provided, which in this case was the entire clause up to the end of subsection -306(a)(2)(A). The use of "provided that" thus created a proviso, or "a provision that begins with the words *provided that* and supplies a condition, exception, or addition." *See* BLACK'S LAW DICTIONARY at 1262 (emphasis in original).

Immediately following "provided, however that . . ." the General Assembly included an exception, narrowly drawn as applying "in counties having a population of not less than twenty-seven thousand nine hundred (27,900) nor more than twenty-seven thousand nine hundred twenty (27,920)." Tenn. Code Ann. § 57-4-306(a)(2)(A) (2013). As the legislative history of the 1982 Amendment indicates, the General Assembly designed the exception to the proviso to apply solely to Bedford County. Given that the

13

above population parameters do not apply to Washington County, we can, for the purpose of our analysis, omit the exception, yielding the following:

> One half (½) of the proceeds shall be expended and distributed in the same manner as the county property tax for schools is expended and distributed; provided, however, that . . . any proceeds expended and distributed to municipalities which do not operate their own school systems separate from the county are required to remit one half (½) of their proceeds of the gross receipts liquor-by-the-drink tax to the county school fund; . . . .

*See id.*

In other words, one-half of the proceeds were to be expended and distributed in the same manner as the county property tax for schools on the condition or understanding that "any proceeds expended and distributed to municipalities which [did] not operate their own school systems separate from the county [were] required to remit one half (½) of their proceeds of the gross receipts liquor-by-the-drink tax to the county school fund." *See id.* (emphasis added). The underlined clause functioned as a restrictive relative clause, restricting the "municipalities" to which this proviso applied to those that did not operate their own school systems.[5]

The City relies in part on this proviso as excluding it from remitting any part of its liquor-by-the-drink proceeds to the County's school system, whether in the manner in which the county property tax for schools is distributed or into the County's school fund, because the City has operated its own school system since at least the 1967 initial enactment of the liquor-by-the-drink tax. We agree that under the plain language of the applicable version of subsection -306(a)(2)(A), the City was excluded from the proviso of remitting one-half of its proceeds into the County's school fund because the City operated its own school system. However, it is not clear from the structure and plain language of the first part of subsection -306(a)(2)(A) whether the City's operation of its own school system excluded it from the general rule that "one-half of the proceeds [were to] be expended and distributed in the same manner as the county property tax for schools [was] expended and distributed[.]" *See id.*

---

[5] Although the relative pronoun, "which," generally would be used to indicate a nonrestrictive relative clause while the relative pronoun, "that," would be used to indicate a restrictive clause, interpreting "which" as nonrestrictive in this instance would be nonsensical because it would mean that no municipalities operated their own school systems. We note also that this "which" clause is not marked by paired commas as a nonrestrictive relative clause normally would be. The drafters appear simply to have made the very common grammatical error of using "which" rather than "that" as a restrictive relative pronoun. *See generally* GARNER, THE REDBOOK, A MANUAL ON LEGAL STYLE at 188-90.

The statute established this general rule and then set forth a condition or understanding that applied to municipalities not operating their own schools. This version of the statute did not clarify whether the opposite of the proviso was true, in other words, whether a municipality operating its own school system could disregard the general rule of distribution in the manner of county property tax and instead distribute one-half of its proceeds to its own school system. Although the placement of the conjunctive adverb, "however," following "provided" in subsection -306(a)(2)(A) would typically indicate that the proviso is in some manner antithetical to the general rule of distribution in the manner of county property tax, it is not clear from the plain language of subsection -306(a)(2)(A) how it would be so.

To summarize, it is possible to reasonably interpret the proviso as simply operating to ensure that a municipality without its own school system would remit one-half of its liquor-by-the-drink proceeds to the county within which it was located. It is also possible to reasonably interpret the proviso as operating to require solely those municipalities not operating their own school systems to remit proceeds to the counties in which they were located, effectively exempting those municipalities that operated their own school systems. The latter interpretation utilizes the longstanding maxim of statutory construction maintaining that "the expression of one thing implies the exclusion of all things not expressly mentioned." *See Limbaugh v. Coffee Med. Ctr.*, 59 S.W.3d 73, 84 (Tenn. 2001) (citing *City of Knoxville v. Brown*, 260 S.W.2d 264, 268 (Tenn. 1953)). We do not find this maxim dispositive in this instance, however, because the statute is ambiguous regarding whether the general rule of distribution in the manner of the property tax for schools would still apply to municipalities to which the proviso does not apply. Because the requirement in Tennessee Code Annotated § 57-4-306(a)(2)(A) (2013) that municipalities without school systems must remit proceeds to counties can be reasonably interpreted in more than one way when municipalities that do operate their own school systems are at issue, we determine this requirement in the applicable version of the statute to be ambiguous. *See Bryant v. HCA Health Servs. of N. Tenn., Inc.*, 15 S.W.3d 804, 809 (Tenn. 2000) ("A statute is ambiguous if the statute is capable of conveying more than one meaning.").

B. Consideration of Statutory Framework, Legislative History, and Other Sources

Having determined that Tennessee Code Annotated § 57-4-306(a)(2)(A) (2013) was ambiguous with regard to whether municipalities with their own school systems were required to remit a portion of liquor-by-the-drink tax proceeds to the counties in which they were located, we now consider the statutory framework, legislative history, and other sources surrounding the version of the statute governing this action. *See Arden v. Kozawa*, 466 S.W.3d 758, 764 (Tenn. 2015) ("Where statutory language is ambiguous, we may decipher legislative intent in other ways, including consideration of the broader

15

statutory scheme, legislative history, and other sources."). We begin with the City's assertion that the trial court erred by declining to find that Tennessee Code Annotated § 57-4-103(a)(1) (2013) operated to render subsection -306 inapplicable to a county, such as Washington County, that had not passed a liquor-by-the-drink referendum. Upon careful review, we conclude that because subsection -103(a)(1) set forth the effectiveness of the entire statutory chapter in which the applicable version of subsection -306(a) was located, subsection -103(a)(1) operated to classify a "local political subdivision" receiving liquor-by-the-drink taxes from the Commissioner as one that had passed a liquor-by-the-drink referendum. We further conclude, however, that this did not necessarily exempt the City from the general requirement of subsection -306(a)(2)(A) of distributing one-half of its liquor-by-the-drink revenue in the manner of county property tax distribution.

Title 57 of the Tennessee Code is entitled, "Intoxicating Liquors." Chapter 4 of Title 57 is entitled, "Consumption of Alcoholic Beverages on Premises," and it consists of three parts: Part 1 – "General Provisions,"; Part 2 – "Administration, Enforcement, Prohibited Acts"; and Part 3 – "Taxes and Fees." This overall structure has remained unchanged since the present action was commenced, as has the language of Tennessee Code Annotated § 57-4-103(a)(1), which provides within the general provisions of Title 57:

> This chapter shall be effective in any jurisdiction which authorizes the sale of alcoholic beverages for consumption on the premises in a referendum in the manner prescribed by § 57-3-106; provided, that, in addition to any other method authorized for holding an election pursuant to § 57-3-106, an election may be held for such sales upon adoption of a resolution by a two-thirds ($^2/_3$) vote of the legislative body of a county or municipality.

We determine this language regarding the effectiveness of Chapter 4 to be clear and unambiguous. Because Part 3 is within Chapter 4, Part 3 is effective in any jurisdiction that has authorized liquor-by-the-drink sales by referendum. *See In re Estate of Tanner*, 295 S.W.3d at 614 ("Any interpretation of the statute that 'would render one section of the act repugnant to another' should be avoided.") (quoting *Tenn. Elec. Power Co. v. City of Chattanooga,* 114 S.W.2d 441, 444 (Tenn. 1937)). Although the statutory scheme regarding alcoholic beverages does not provide a definition of "jurisdiction" as it is used in subsection §-103(a)(1), we further determine that the generally accepted definition of jurisdiction as it applies to governmental authority is applicable within the context of a jurisdiction's authorization of alcoholic beverage sales. Black's Law Dictionary defines "jurisdiction" within this context of governmental authority as a "government's general power to exercise authority over all persons and things within its territory," "geographic area within which political . . . authority may be exercised," or

"political . . . subdivision within such an area." BLACK'S LAW DICTIONARY at 867. Therefore, at the time this action was commenced, Part 3 of Chapter 4 was effective in the jurisdiction of the City, which had authorized liquor-by-the-drink sales, but was not effective in the jurisdiction of the County, which had not authorized such sales.

The City argues that the ineffectiveness of Tennessee Code Annotated § 57-4-306(a) (2013) in the jurisdiction of the County means that the City was not required to remit any portion of its liquor-by-the-drink proceeds distributed by the Commissioner to the County. However, we do not agree that this conclusion automatically follows from subsection -103(a)(1) because the City, as a jurisdiction having authorized the sale of alcoholic beverages for consumption on the premises, *see* Tenn. Code Ann. § 57-4-103(a)(1), and thereby a local political subdivision receiving liquor-by-the-drink gross receipt taxes from the Commissioner, *see* Tenn. Code Ann. § 57-4-306(a)(2), was required to follow the requirements of Chapter 4. This analysis leads us back to the ambiguity previously identified in subsection -306(a)(2)(A) but does not clarify it. It is still possible to reasonably interpret the proviso of subsection -306(a)(2)(A) as either simply ensuring that a municipality without its own school system would remit one-half of its liquor-by-the-drink proceeds to the county within which it was located or as actually exempting municipalities with their own school systems, such as the City of Johnson City, from the general requirement of distributing one-half of their liquor-by-the-drink revenue in the manner of county property tax distribution.

Inasmuch as Tennessee Code Annotated § 57-4-306(a)(2)(A) (2013) provided that "[o]ne half (½) of the proceeds shall be expended and distributed in the same manner as the county property tax for schools is expended and distributed," it is important to consider the statutory scheme for expenditure and distribution of the county property tax for schools. Tennessee Code Annotated § 49-3-315(a) (2016) provides in pertinent part:

> For each LEA [local education agency] there shall be levied for current operation and maintenance not more than one (1) school tax for all grades included in the LEA. Each LEA shall place in one (1) separate school fund all school revenues for current school operation purposes received from the state, county and other political subdivisions, if any. . . . All school funds for current operation and maintenance purposes collected by any county . . . shall be apportioned by the county trustee among the LEAs in the county on the basis of the WFTEADA [weighted full-time equivalent average daily attendance] maintained by each, during the current school year. For the purposes of making the apportionment of local school funds as set forth in this subsection (a), and in defining the WFTEADA for the current school

17

year, the county director of schools and the county trustee shall be guided by the following procedure: . . . .[6]

The above statute goes on to delineate the procedure by which the county director of schools shall certify to the county trustee the weighted full-time equivalent average daily attendance ("WFTEADA") during the preceding school year and, in progressive fashion, estimate "the WFTEADA in the schools of the LEAs in the county" for successive quarters of the current and upcoming years. *See* Tenn. Code Ann. § 49-3-315(a)(1)-(5). Although the statutory procedure for determining the WFTEADAs involves county officials, the City, as a local political subdivision receiving liquor-by-the-drink tax revenue, would be able to remit a portion of those gross receipt taxes received from the Commissioner to the County's school fund, which arguably could then be distributed by the County according to the procedure delineated in the above statute. *See* Tenn. Code Ann. § 49-3-315(a) ("Each LEA shall place in one (1) separate school fund all school revenues for current school operation purposes received from the state, county and <u>other political subdivisions</u> . . . .") (emphasis added).

The question arises as to whether, if the County were successful in the present action, funds remitted by the City to the County's school fund would in turn be partially apportioned to schools operated by the City as LEAs geographically existing within the County. This Court recently interpreted Tennessee Code Annotated § 49-3-315(a) in light of whether a county was required to apportion funds from its "educational capital projects fund" to the school boards of cities located within the county. *See City of Athens Bd. of Educ. v. McMinn Cty.*, 467 S.W.3d 458, 459-60 (Tenn. Ct. App. 2014), *perm. app. denied* (Tenn. May 14, 2015). This Court noted that, with one exception for transportation levies not relevant here, "[a]ll school funds *for current operation and maintenance purposes* collected by any county . . . shall be apportioned by the county trustee among the LEAs," including those LEAs operated by the cities located in the county. *Id.* at 460 (quoting Tenn. Code Ann. § 49-3-315(a)) (emphasis in *City of Athens*). Because the funds at issue in *City of Athens* had been collected by the county through levying "a special tax designated for a capital projects fund," this Court held that the funds had not been collected "for current operation and maintenance purposes" and therefore did not fall under the purview of Tennessee Code Annotated § 49-3-315(a). *City of Athens*, 467 S.W.3d at 465-66 (affirming the trial court's grant of summary judgment in favor of the county).

In the current analysis, the County is requesting that this Court interpret the language of Tennessee Code Annotated § 57-4-306(a)(2)(A) (2013) to mean that twenty-five percent (half of the amount returned to the local political subdivision by the

---

[6] The definitions in brackets are provided pursuant to Tennessee Code Annotated §§ 49-1-103(2) (2016) (LEA) and 49-3-302(18) (2016) (WFTEADA).

Commissioner) of the gross receipt liquor-by-the-drink taxes collected within the incorporated limits of the City would be paid in the manner of the county property tax to the county school fund for distribution to all of the LEAs in the County, including those located within the City. Because such a distribution within the County of funds obtained from a "local political subdivision" such as the City is possible, *see* Tenn. Code Ann. § 49-3-315(a), we do not find the statutory scheme for expenditure and distribution of the county property tax for schools to be dispositive of the ambiguity previously identified in Tennessee Code Annotated § 57-4-306(a)(2)(A) (2013).

However, we do find the legislative history surrounding the 1982 Amendment, which added the ambiguous language at issue to Tennessee Code Annotated § 57-4-306(a), to be instructive of the General Assembly's intent. Prior to the 1982 Amendment, the subject statutory section, then codified at § 57-162, provided in full:

> **Distribution of collections.**—All gross receipt taxes collected under subdivision (b) of § 57-157 shall be distributed by the commissioner of revenue as follows:
>
> (a)    Fifty percent (50%) to the general fund to be earmarked for education purposes; and
>
> (b)    Fifty percent (50%) to the local political subdivision.
>
>     (1)    One half (½) of the proceeds shall be expended and distributed in the same manner as the county property tax for schools is expended and distributed.
>
>     (2)    The other one half (½) shall be distributed as follows:
>
>         (a)    Collections of gross receipts collected in unincorporated areas, to the county general fund; and
>
>         (b)    Collections of gross receipts in incorporated cities, towns, to the city or town wherein such tax is collected.

Tenn. Code Ann. § 57-162 (1968).

In introducing the applicable Senate bill to the Finance, Ways and Means Committee in March 1982, Senator Albright explained the bill's purpose as follows:

Right now, the law provides that one-half of one percent of the gross receipts by liquor by the drink tax goes to the, to, into the school system – provide into the school system – goes to the city for the school systems. In many counties, the cities do not operate a school system. They have been turning this over to the county because the county provides that school system for the city. There has been some. There was a couple of 'em. I have a whole bunch of little cities around Chattanooga. There was a couple of them that did not want to return this money over. They simply asked for an Attorney General's ruling that the legislative intent was that that's where it would go in the school system. And they didn't have a school system, they shouldn't be getting the money. That's an Attorney General ruling. Our county simply said rather than have an Attorney General's ruling, which – cause they would like to put this in legislation. And this just provides, however, then if proceeds expanding or distribution to municipalities which do not operate their own school system separate from the county, are required to remit one-half of their proceedings from the gross receipts liquor by the drink tax to the county school fund. And that is where it is intended to go anyway.

As the sponsoring legislator, Senator Albright then engaged in the following exchange with a committee member, Senator Crouch:

Senator Crouch: In other words, if, uh, we [are] still operating a city school system it doesn't affect –

Senator Albright: It doesn't affect you at all. It goes to the city –

Senator Crouch: They're still getting their . . . percent?

Senator Albright: See the legislation . . . says for the school fund. That's what the –

Senator Crouch: Okay.

Senator Albright thus assured Senator Crouch that if a municipality were operating its own school system, the provision added by the 1982 Amendment would not affect the municipality because the liquor-by-the-drink taxes returned by the commissioner would still go "to the city."

In introducing the bill to the committee, Senator Albright referenced a "ruling" of the attorney general.  At this point in time, the attorney general had issued two opinions interpreting the distribution scheme set forth in Tennessee Code Annotated § 57-4-306, the first in September 1980 ("1980 AG Opinion"), *see* Tenn. Op. Atty. Gen. 80-457, 1980 WL 103875 (Sept. 19, 1980), and the second in April 1981 ("1981 AG Opinion"), *see* Tenn. Op. Atty. Gen. 81-270, 1981 WL 142843 (Apr. 27, 1981).  We note that "although opinions of the Attorney General may be persuasive authority, they are not controlling." *Beacon4, LLC v. I & L Invs., LLC*, 514 S.W.3d 153, 173 (Tenn. Ct. App. 2016).  However, we do afford such opinions "'considerable deference,'" particularly because "'government officials rely upon them for guidance.'"  *See id.* (quoting *State v. Black,* 897 S.W.2d 680, 683 (Tenn. 1995)).  As to the statutory section at issue in this action, a series of three attorney general's opinions, released from 1981 to 1983, are informative concerning the situation surrounding the 1982 Amendment.  Moreover, insofar as legislators indicated while introducing and explaining the 1982 Amendment that they were responding to various municipalities' reliance on the attorney general's 1980 and 1981 opinions, those opinions are integral to the legislative history as well.

The question proffered in the 1980 AG Opinion focused on the situation presented when a municipality had passed a liquor-by-the drink referendum but the county in which the municipality was located had not.  *See* Tenn. Op. Atty. Gen. 80-457, 1980 WL 103875, at *1.  The attorney general opined:

> It is the opinion of this office that if a municipality but not the county has approved by referendum the sale of alcoholic beverages for consumption on the premises the fifty percent (50%) distribution, under T.C.A. § 57-4-306(2), of the gross receipts tax collected would go entirely to the local municipality.

*Id.*  The attorney general further concluded:

> [I]f there has been no countywide election approving the sale of alcoholic beverages for consumption on the premises in accord with T.C.A. § 57-4-103, then the provisions of Chapter 4 dealing with both the imposition of the tax and the distribution of the tax would have no application to such county and it would not be entitled to a distribution of any amounts under T.C.A. § 57-4-306(2) which go to the local political subdivision.  Such local political subdivision, i.e., the city or town, would then be required to expend one half of the amount received <u>in the same manner as the county property tax for schools would be expended within the city or town</u>.

21

*Id.* at *2 (emphasis added). Thus, according to the 1980 AG Opinion, a municipality acting as the local political subdivision receiving gross receipt liquor-by-the-drink taxes would be required to expend and distribute one-half of the monies returned by the commissioner solely to the schools located within the municipality.

The 1980 AG Opinion did not address the distinction between a municipality that operated its own school system and one that utilized a county school system to educate its students. However, this question was the focus of the 1981 AG Opinion, with the attorney general opining: "[T]hose municipalities which do not operate their own school system separate from the county would be required to remit one-half of [their] proceeds of the gross receipts liquor-by-the-drink tax to the county school fund." Tenn. Op. Atty. Gen. No. 81-270, 1981 WL 142843, at *1. Building on the prior analysis of Tennessee Code Annotated § 57-4-306 in the 1980 AG Opinion, the attorney general reasoned as follows:

> If the local municipality does not operate a separate school system, the one-half of the proceeds expended and distributed in the same manner as the county property tax for schools as mandated by subparagraph (A) would naturally have to be remitted to the county school fund.
>
> It appears clear that the purpose of the statute is to earmark a certain percentage of the proceeds of such taxes for the purpose of local education. This objective could be accomplished by the remittance of such amount to the county school fund where the municipality itself does not operate its own school system.

Tenn. Op. Atty. Gen. No. 81-270, 1981 WL 142843, at *1.

In introducing to his committee the Senate bill that became the 1982 Amendment, Senator Albright expressed an intent to codify the attorney general's opinion, requiring municipalities not operating their own school systems "to remit one-half of their proceedings from the gross receipts liquor by the drink tax to the county school fund." In sponsoring the bill during a March 4, 1982 session of the entire Senate, Senator Albright stated in pertinent part:

> This bill . . . just puts into law what's been the practice. And it says that one-half of the proceeds of the gross receipt liquor by the drink to the county school system where the city does not provide one.

The following exchange occurred in response:

Senator Darnell:     Senator Albright as I understand it this is to make sure that the funds actually go to, to the county for schools – is that the intent of the bill?   Or is that just a peripheral sort of thing that's involved here?

Senator Albright:     This just makes sure – right some of, in my area in Chattanooga – we've had a couple of them that had to be told, you don't have your own school system – the county permits this – the statute says – can I just read one brief sentence –

Senator Darnell:     --they won't turn over the money to the county?

Senator Albright:     This would make it that they have to turn it over.

This exchange demonstrates that when he stated previously that a city would have to distribute gross receipt taxes to the county in which it was located "where the city does not provide one," Senator Albright meant a city that does not provide a school system. At the close of the March 4, 1982 session, the Senate approved the bill as sponsored by Senator Albright.

We determine that as presented to and adopted in the Senate, the legislative intent of the 1982 Amendment was to correct a situation in which some municipalities that did not operate their own school systems were failing to distribute the statutorily required portion of liquor-by-the-drink gross receipt taxes to the counties whose school systems they utilized.   As explained by the Senate sponsor, the intent was not to require municipalities that operated their own school systems to distribute liquor-by-the-drink revenue to the corresponding counties.

Subsequently, Representative Davis introduced the companion bill to the House Calendar and Rules Committee on April 7, 1982, by stating in relevant part:

Mr. Chairman and Members of the Committee House Bill 2277 provides that if, provides that in the distribution of liquor, local liquor by the drink taxes that it will be distributed as it is now in the same fashion that local property taxes is distributed for education.   In the event that the municipality affected operates a school system, right now the, the reason for division in the law originally was for this percentage of the money to go [to] education – fifty percent to the county, fifty percent to the municipality involved.   There are municipalities such as the one involved in my county that are collecting this tax but that are, that are not operating school

23

systems. This simply changes the law to provide that in the event the city does not operate a, a, the school system, that the money will go to the county.

In response to a committee member's question regarding under what circumstances the proviso added by the 1982 Amendment would be "activated," Representative Davis replied:

If there's, if a municipality is operating its own system it'll continue to get its share of the liquor by the drink money. Uh, only if it's not operating a school system and thereby using the county school system uh, will the money that has been going to the municipality for education go instead to the county.

The House approved the bill, with an amendment added to exclude Bedford County, in a vote taken during a full session conducted on May 5, 1982.[7] In introducing the bill to the House as a whole during an April 8, 1982 session, Representative Davis presented it as a remedy to a situation in which "[a]t the present time, there is no provision . . . that those municipalities that do not operate school systems will permit the money – which is to go to education from the liquor by the drink tax – to go to the county." The Senate subsequently adopted the bill as amended by the House without further discussion.

Upon thorough review of the language of the statute in light of the statutory framework, legislative history, and attorney general's opinions referenced by the legislative history, we hold that the General Assembly's intent in enacting the 1982 Amendment to Tennessee Code Annotated § 57-4-306(a)(2)(A) was to require solely those municipalities that did not operate their own school systems to share liquor-by-the-drink tax proceeds with the counties in which they were located. This conclusion is also supported by an opinion issued by the attorney general in January 1983, six months following enactment of the 1982 Amendment ("1983 AG Opinion"). *See* Tenn. Op. Atty. Gen. No. 83-36, 1983 WL 166853 (Jan. 18, 1983). Concluding that "the 1982 amendment to the statute was merely a codification of our opinion dated April 27, 1981," the attorney general opined in pertinent part:

It is the opinion of this office that the proper distribution of the liquor-by-the-drink gross receipt privilege taxes under T.C.A. § 57-4-306(2)(A) depends upon whether a municipality maintains a separate school system,

---

[7] During the April 7, 1982 House Calendar and Rules Committee meeting, Representative Phillips from Bedford County explained that his county was requesting an exception because a municipality within the county owned and paid expenses on buildings operated by the county's school system.

when the municipality but not the county has approved by referendum the sale of alcoholic beverages for consumption on the premises.

\* \* \*

If the municipality does operate a separate school system, it would be entitled to the fifty percent of the liquor-by-the-drink gross receipts privilege tax collected under T.C.A. § 57-4-306(2)(A).

*Id.* at *1. Although opinions of the attorney general are but persuasive authority, *see Beacon4*, 514 S.W.3d at 173, we conclude that the 1983 AG Opinion merits considerable deference given its issuance contemporaneously with the General Assembly's enactment of the 1982 Amendment and its consistency with the 1980 and 1981 opinions referenced by legislators who sponsored the 1982 Amendment. *See id.*

### C. 2014 Amendment to Tennessee Code Annotated § 57-4-306

Having concluded that the General Assembly's intent in enacting the 1982 Amendment was to require solely those municipalities that did not operate their own school systems to share liquor-by-the-drink tax proceeds with the counties in which they were located, we further determine that nothing in the General Assembly's adoption of the 2014 Amendment contradicts this conclusion. It is undisputed that the 2014 Amendment was not adopted with retroactive application. As the County notes, when analyzing legislative intent, we may view a subsequent, non-retroactive amendment as "'declaratory of the original legislative intent.'" *See Sneed v. City of Red Bank*, 459 S.W.3d 17, 32 (Tenn. 2014) (quoting *Fretwell v. Chaffin*, 652 S.W.2d 755, 757 (Tenn. 1983)). However, being mindful of the thirty-two-year time span between the 1982 and 2014 Amendments, we agree with the City that the best indicator of legislative intent in this instance is the legislative history surrounding the 1982 Amendment itself.

Moreover, although, as the trial court found, the 2014 Amendment provided for a process by which counties that were owed funds by municipalities under Tennessee Code Annotated § 57-4-306 could seek those funds and negotiate settlements as applicable, we determine that nothing in the amended statutory language provided that municipalities operating their own kindergarten through twelfth-grade school systems, separate from the counties in which the municipalities were located, owed such funds to the corresponding counties. *See* Tenn. Code Ann. § 57-4-306 (Supp. 2014); 2014 Tenn. Pub. Acts, Ch. 901 § 1 (H.B. 1403). As amended in 2014, Tennessee Code Annotated § 57-4-306(a) provided:

(a)      All gross receipt taxes collected under § 57-4-301(c) shall be distributed by the commissioner of revenue as follows:

    (1)      Fifty percent (50%) to the general fund to be earmarked for education purposes; and

    (2)      The other fifty percent (50%) to be distributed to local political subdivisions as follows:

        (A)      Collections for privileges exercised in an incorporated municipality shall be distributed by the commissioner to the city recorder; and

        (B)      Collections for privileges exercised in an unincorporated area of the county shall be distributed by the commissioner to the county trustee.

Subsection (a) was thus amended to expressly provide for more than one local political subdivision, with distribution of collections for privileges exercised to be sent to the city recorder for those collections originating from a municipality and to the county trustee for those collections originating from unincorporated areas of a county. *See* Tenn. Code Ann. § 57-4-306(a) (Supp. 2014). Subsections (b) through (h) then provided a distribution scheme for liquor-by-the-drink proceeds received from July 1, 2014, until June 30, 2015. *See id.* at -306(b)-(h).[8] Although we find a detailed analysis of this distribution scheme unwarranted in an analysis of the prior version of the statute, we have examined the distribution scheme of the 2014 Amendment and determined that it essentially follows the ongoing intent of the General Assembly to have a portion of the proceeds from the liquor-by-the-drink tax benefit children who attend school within the jurisdiction, incorporated municipality or unincorporated county, wherein the gross receipts originated. *See id.* Insofar as the County argues that the 2014 Amendment demonstrates a contrary legislative intent underlying the 1982 Amendment, the County's argument is unavailing.

Finally, the County posits that the trial court properly determined that public policy regarding funding education equally for all students and principles of equity support the conclusion that a municipality must share its liquor-by-the-drink tax revenue with the county in which it is located. However, as the City notes, Tennessee Code

---

[8] As noted previously, the General Assembly has amended Tennessee Code Annotated § 57-4-306 each year since the 2014 Amendment, extending the amended language in subsequent years, one year at a time. *See* 2015 Tenn. Pub. Acts, Ch. 220 §§ 1, 2 (S.B. 990); 2016 Tenn. Pub. Acts, Ch. 885 §§ 1, 2 (H.B. 1691); 2017 Tenn. Pub. Acts, Ch. 346 §§ 1, 2 (S.B. 1262).

Annotated § 57-3-106(a) (2013 & Supp. 2017) provides for a local option election in any county wherein the voters may decide to either permit or forbid "the manufacture, receipt, sale, storage, transportation, distribution and possession of alcoholic beverages . . . ." Even in counties, such as the County in this action, that have not approved a liquor-by-the-drink referendum, students benefit from the distribution of fifty percent of liquor-by-the-drink gross receipt taxes to the state's general fund, earmarked for education. *See* Tenn. Code Ann. § 57-4-306(a)(1).

Moreover, such an argument concerning perceived fairness of the tax distribution scheme provided by the statute would properly be directed to the General Assembly rather than to this Court. *See, e.g., City of Athens Bd. of Educ.*, 467 S.W.3d at 466 ("However compelling this argument [regarding the city's receiving its "fair share" of property taxes designated for county capital improvements] may be, it is properly directed to others, e.g., the General Assembly, not to this Court."). Inasmuch as we must apply Tennessee Code Annotated § 57-4-306 as it was amended in 1982 and as the General Assembly intended the amendment, we hold that, as a matter of law, the applicable version of the statute did not require the City to share its liquor-by-the-drink proceeds with the County.[9] The trial court erred by granting declaratory judgment in favor of the County on this issue. We therefore reverse the trial court's grant of declaratory judgment and grant summary judgment, as a matter of law, in favor of the City, dismissing the County's complaint.

## V. Conclusion

For the reasons stated above, we reverse the trial court's declaratory judgment in favor of the County. We grant summary judgment, as a matter of law, in favor of the City and dismiss the County's complaint. This case is remanded to the trial court, pursuant to applicable law, for collection of costs assessed below. The costs on appeal are assessed against the appellees, the Washington County School System, by and through the Washington County Board of Education, and Washington County, Tennessee.

_____
THOMAS R. FRIERSON, II, JUDGE

---

[9] In support of its position, the City also argues that if this Court were to adopt the County's interpretation of Tennessee Code Annotated § 57-4-306 (2013) and hold that a privilege tax collected in the City should have benefitted citizens of another jurisdiction, such a holding would render the statute in violation of Article II, Section 29 of the Tennessee Constitution. Having determined that the applicable version of Tennessee Code Annotated § 57-4-306 did not require the City to share its liquor-by-the-drink proceeds with the County, we further determine the City's constitutional argument to be pretermitted as moot.